# EXHIBIT   A



**C O B A L T**

April 28, 2005

<u>**Via Certified Mail - Return Receipt Requested**</u>

Raymond V. Gilmartin                          Kenneth C. Frazier
Chairman, President and Chief Executive       Senior Vice President and General Counsel
Officer                                       Merck & Co., Inc.
Merck & Co., Inc.                             One Merck Drive
One Merck Drive                               Whitehouse Station, NJ 08889-0100
Whitehouse Station, NJ 08889-0100

     Re:   **Notification of Certification of Invalidity and/or Noninfringement for U.S.
           Patent Nos. 5,849,726; 6,008,207; 5,994,329; 6,015,801; 6,225,294; 5,358,941;
           5,681,590; and 6,090,410 Pursuant to § 505(j)(2)(B)(iv) of the Federal Food,
           Drug, and Cosmetic Act**

Dear Sirs:

        Pursuant to § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act and
21 C.F.R. § 314.95, Cobalt Pharmaceuticals Inc. ("Cobalt") hereby provides notice of the
following information to Merck & Co., Inc., the owner of U.S. Patent Nos. 5,849,726 ("the '726
patent"); 6,008,207 ("the '207 patent"); 5,994,329 ("the '329 patent"); 6,015,801 ("the '801
patent"); 6,225,294 ("the '294 patent"); 5,358,941 ("the '941 patent"); 5,681,590 ("the '590
patent"); and 6,090,410 ("the '410 patent"), according to the records of the U.S. Patent and
Trademark Office, and the holder of approved New Drug Application ("NDA") No. 20-560 for
Fosamax® (alendronate sodium) Tablets 35 mg, 40 mg and 70 mg, according to the records of
the U.S. Food and Drug Administration ("FDA"):

        I.     Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(I) and 21 C.F.R. § 314.95(c)(1),
we advise you that FDA has received an Abbreviated New Drug Application ("ANDA") from
Cobalt for Alendronate Sodium Tablets 35 mg, 40 mg and 70 mg. The ANDA contains the
required bioavailability and/or bioequivalence data from studies on the alendronate sodium tablet
drug products that are the subject of the ANDA. The ANDA was submitted under 21 U.S.C. §§
355(j)(1) and (2)(A), and contains paragraph IV certifications to obtain approval to engage in the
commercial manufacture, use or sale of Alendronate Sodium Tablets 35 mg, 40 mg and 70 mg
before the expiration of the '726, '207, '329, '801, '294 , '941, '590, and '410 patents, which are

6500 KITIMAT ROAD
   MISSISSAUGA, ONTARIO
CANADA, L5N 2B8

905 814 1820   1 866 254 6111   905 814 8696

Merck & Co., Inc.
April 28, 2005
Page 2

listed in the Patent and Exclusivity Information Addendum of FDA's publication, *Approved Drug Products With Therapeutic Equivalence Evaluations* (commonly known as "the Orange Book").

II.    Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that the ANDA submitted by Cobalt has been assigned the number 76-984 by FDA.

III.    Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established name of the drug products that are the subject of Cobalt's ANDA is Alendronate Sodium Tablets 35 mg, 40 mg and 70 mg.

IV.    Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active ingredient in the proposed drug products is alendronate sodium trihydrate; the strengths of the proposed drug products are 35 mg, 40 mg and 70 mg (wherein the strengths are measured with respect to the free acid form of alendronate sodium trihydrate, namely alendronic acid); and the dosage form of the proposed drug products is a tablet.

V.    Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patents alleged to be invalid and/or not infringed in the paragraph IV certifications are Merck's '726, '207, , '941, '590, and '410 patents, which are listed in the Orange Book in connection with Merck's approved NDA No. 20-560 for Fosamax® (alendronate sodium) Tablets 35 mg, 40 mg, and 70 mg, and Merck's '329, '801, and '294 patents, which are listed in the Orange Book in connection with Merck's approved NDA No. 20-560 for Fosamax® (alendronate sodium) Tablets 35 mg and 70 mg. According to information provided by Merck to FDA that is published in the Orange Book, the '726 patent will expire on or about June 6, 2015; the '207 patent will expire on or about June 6, 2015; the '329 patent will expire on or about July 17, 2018; the '801 patent will expire on or about July 17, 2018; the '294 patent will expire on or about July 17, 2018; the '941 patent will expire on or about December 2, 2012; the '590 patent will expire on or about December 2, 2012; and the '410 patent will expire on or about December 2, 2012.

VI.    Cobalt alleges, and has certified to FDA, that in Cobalt's opinion and to the best of its knowledge, the '726, '207, '329, '801, '294, '941, '590, and '410 patents are invalid and/or will not be infringed by the commercial manufacture, use or sale of the drug products described in Cobalt's ANDA. Therefore, pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(II) and 21 C.F.R. § 314.95(c)(6), Cobalt's detailed statement of the legal and factual basis for the paragraph IV certification set forth in Cobalt's ANDA is attached hereto and made part hereof.

VII.    Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III), Cobalt offers to provide confidential access to certain information from its ANDA No. 76-984 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Section 355(j)(5)(C)(i)(III) allows Cobalt to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply



Merck & Co., Inc.
April 28, 2005
Page 3

had a protective order been entered—for the purpose of protecting trade secrets and other confidential business information." That provision also grants Cobalt the right to redact its ANDA in response to a request for Confidential Access under this offer.

As permitted by statute, Cobalt imposes the following terms and restrictions on its Offer of Confidential Access:

(1)    Cobalt will permit confidential access to certain information from its proprietary ANDA No. 76-984 to attorneys from one outside law firm representing Merck; provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution for Merck or any FDA counseling, litigation or other work before or involving FDA. Such information (hereinafter, "Confidential Cobalt Information") shall be marked with the legend "CONFIDENTIAL."

(2)    The attorneys from the outside law firm representing Merck shall not disclose any Confidential Cobalt Information to any other person or entity, including Merck employees, outside scientific consultants, and/or other outside counsel retained by Merck, without the prior written consent of Cobalt's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP.

(3)    As provided by § 355(j)(5)(C)(i)(III), Merck's outside law firm shall make use of the Confidential Cobalt Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Cobalt Information shall not be used to prepare or prosecute any future or pending patent application by Merck, or in connection with any filing to, or communication with, FDA relating to Cobalt's ANDA No. 76-984. Merck's outside law firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Cobalt Information, and that all Confidential Cobalt Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

(4)    The Confidential Cobalt Information disclosed is, and remains, the property of Cobalt. By providing the Confidential Cobalt Information, Cobalt does not grant Merck and/or its outside law firm any interest in or license for the Confidential Cobalt Information.

(5)    Merck's outside law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Cobalt Information, return to Cobalt's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP, all Confidential Cobalt Information and any copies thereof. Merck's outside law firm shall return all Confidential Cobalt Information to RAKOCZY MOLINO MAZZOCHI SIWIK LLP before any infringement suit is filed by Merck, if suit is commenced before this 35-day period expires. In the event that Merck opts to file suit, none of the information contained in or obtained from any Confidential Cobalt Information



Merck & Co., Inc.
April 28, 2005
Page 4

that Cobalt provides shall be included in any publicly-available complaint or other pleading.

(6)     Nothing in this Offer of Confidential Access shall be construed as an admission by Cobalt regarding the validity, enforceability, and/or infringement of any U.S. patent. Further, nothing herein shall be construed as an agreement or admission by Cobalt with respect to the competency, relevance, or materiality of any such Confidential Cobalt Information, document, or thing. The fact that Cobalt provides Confidential Cobalt Information upon request of Merck shall not be construed as an admission by Cobalt that such Confidential Cobalt Information is relevant to the disposition of any issue relating to any alleged infringement of the '726, '207, '329, '801, '294, '941, '590, and '410 patents, or to the validity or enforceability of those patents.

(7)     The attorneys from Merck's outside law firm shall acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Cobalt Information. Such written acknowledgement shall be provided to Cobalt's outside litigation counsel, RAKOCZY MOLINO MAZZOCHI SIWIK LLP.

(8)     This Offer of Confidential Access shall be governed by the laws of the State of Illinois.

Section 355(j)(5)(C)(i)(III) provides that any request for access that Merck makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in [this] offer of confidential access" and that the "restrictions and other terms of [this] offer of confidential access shall be considered terms of an enforceable contract." Thus, to the extent that Merck requests access to Confidential Cobalt Information, it necessarily accepts the terms and restrictions outlined above. Written notice requesting access under this Offer of Confidential Access should be made to:

>       William A. Rakoczy
>       RAKOCZY MOLINO MAZZOCHI SIWIK LLP
>       6 West Hubbard Street, Suite 500
>       Chicago, Illinois 60610
>       Tel: (312) 222-6301
>       Fax: (312) 222-6321
>       wrakoczy@rmmslegal.com

By providing this Offer of Confidential Access to Application, Cobalt maintains the right and ability to bring and maintain a Declaratory Judgment action under 28 U.S.C. §§ 2201 *et seq.*, pursuant to 21 U.S.C. § 355(j)(5)(C).

Merck & Co., Inc.
April 28, 2005
Page 5

   Solely for the purposes of any infringement action commenced based on this notification of certification for ANDA No. 76-984, Cobalt hereby consents to the jurisdiction of the United States District Court for the Eastern District of Virginia.  The name and address of the agent in the United States authorized to accept service of process for Cobalt, limited to commencement of a patent infringement suit based on this notification of certification, is:

     Conrad M. Shumadine
     WILLCOX & SAVAGE
     One Commercial Place, Suite 1800
     Norfolk, Virginia 23510
     Tel:  (757) 628-5525
     Fax:  (757) 628-5566
     cshumadine@wilsav.com

Very truly yours,

COBALT PHARMACEUTICALS INC.

By: _____
  Mr. Ian Jacobson
  C.O.O

Enclosure

**Detailed Factual and Legal Basis for Cobalt's Paragraph IV Certification That**
**U.S. Patent Nos. 5,849,726; 6,008,207; 5,994,329; 6,015,801; 6,225,294;**
**5,358,941; 5,681,590; and 6,090,410 are Invalid and/or Not Infringed**

## I.    Introduction.

Pursuant to § 505(j)(2)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic Act and 21 C.F.R. § 314.95(c)(6), this document is the detailed factual and legal basis for the paragraph IV certifications of Cobalt Pharmaceuticals Inc. ("Cobalt") that, in its opinion and to the best of its knowledge, U.S. Patent Nos. 5,849,726; 6,008,207; 5,994,329; 6,015,801; 6,225,294; 5,358,941; 5,681,590; and 6,090,410 are invalid and/or will not be infringed by the commercial manufacture, use or sale of the drug products described in Cobalt's ANDA No. 76-984. Cobalt specifically reserves the right to raise any additional defenses should litigation ensue.

## II.    Cobalt's ANDA Product and Label.

Cobalt's product is a tablet containing, as the active ingredient, alendronate sodium trihydrate (hereinafter "Cobalt's ANDA Product"). Cobalt's ANDA Product does not contain risedronate, ibandronate or any equivalent compound.

The strengths of Cobalt's ANDA Product are 35 mg, 40 mg, and 70 mg (wherein the strengths are measured with respect to the free acid form of alendronate sodium trihydrate, namely, alendronic acid). Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended solely for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for solely once-daily dosing for six months. Cobalt's ANDA Product is not labeled or intended for twice-weekly, biweekly, twice-monthly dosing, or sequential use with a histamine H2 blocker or proton pump inhibitor.

Cobalt manufactures its ANDA Product using a wet granulation process. Cobalt does not use a dry-mix or direct compression process. Cobalt's ANDA Product does not contain or employ anhydrous alendronate sodium, anhydrous lactose, or hydrous fast flow lactose.

## III.    Legal Standards.

### A.    Patent Infringement.

A patent infringement analysis consists of two steps: (1) determining the scope of the claims, a legal issue for the court; and (2) comparing the accused product to the claims, a factual question. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). A claim may be infringed either: (1) literally or, (2) under the judicially-created doctrine of equivalents. *See id.* Moreover, because a dependent claim incorporates all of the elements and limitations of the independent claim on which it depends, a dependent claim cannot be infringed unless each and every element of the underlying independent claim is also infringed. *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001).

1.    **Claim Construction.**

"It is axiomatic that the claims mark the outer boundaries of the patent right to exclude." *AstraZeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004). The "goal of claim construction is to determine what an ordinary artisan would deem the invention claimed by the patent, taking the claims together with the rest of the specification." *Id.* at 1337; *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001) (noting that claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." (quotation omitted)).

The intrinsic evidence, including the claims, the specification, and the prosecution history, is the primary source for determining claim meaning. *See AstraZeneca*, 384 F.3d at 1336; *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 979-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The claim construction inquiry begins with the plain and ordinary meaning of the claims, which define the scope of the right to exclude. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "When construing patent claims, there is a heavy presumption that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention." *Housey Pharms., Inc. v. Janssen UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004) (citations and internal quotation marks omitted).

A patentee may assign a claim term a meaning "other than its ordinary and accustomed meaning. . . . if the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (examining the scope of the term "heading" through its use by the patentee throughout the specification). However, if he or she intends to ascribe a meaning to a term other than its ordinary meaning, a clear and unambiguous demonstration of that meaning must be found in the specification. *See Markman*, 52 F.3d at 979-80; *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000). Significantly, however, the Federal Circuit has recently made clear that rigid formalism in this regard is not required. *See AstraZeneca*, 384 F.3d at 1339 (rejecting argument that lexicography requires rigid formalism and explicit statements of definition). Lexicography does not require a "statement in the form 'I define _____ to mean ____,'" but rather can be accomplished in a more subtle manner or even by implication. *Id.; see also Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition. . . . [T]he specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" (internal citations omitted)).

The specification also should be consulted to determine whether the patentee has disavowed or relinquished claim scope. *See SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims . . . might be considered broad enough to encompass the feature in question."); *AstraZeneca*, 384 F.3d at 1340 ("Where the general summary or description of the invention . . . criticizes other products . . . that lack that same feature, this operates as a clear disavowal of these other products . . .")

-2-

In addition, a patentee cannot recapture in litigation a claim scope surrendered during the prosecution of the patent, either by amendment or argument. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376-77 (Fed. Cir. 1999); *see also Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.").

### 2.    Comparison of the Accused Product to the Properly Construed Claims.

#### a.    Literal Infringement.

Literal infringement requires a patentee to prove that every limitation of the asserted claim is literally met by the accused product. *Enercon GmbH v. United States Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998); *see also Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) (literal infringement occurs when "the properly construed claim reads on the accused device exactly"). The failure to meet even a single element within a claim mandates a finding that the accused product does not literally infringe the patent. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

#### b.    Doctrine of Equivalents.

Infringement under the doctrine of equivalents requires the patentee to show, for each claim asserted, the presence of each and every claim element or its substantial equivalent in the accused device. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732-33 (2002). An equivalent of a missing claim element or limitation is found only if "'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused [product]." *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1329 (Fed. Cir. 2003) (quoting *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997)).

However, the scope and application of this doctrine is limited. The Supreme Court has warned that "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson*, 520 U.S. at 29. Under this "all elements rule, there can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003). In addition, the scope of permissible equivalents cannot encompass or ensnare what is already in the prior art. *See Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999). Likewise, under the doctrine of prosecution history estoppel, an equivalent cannot be extended to include subject matter surrendered by the patentee either in amendments to overcome patentability rejections or in arguments to secure allowance of a claim. *See Warner-Jenkinson*, 520 U.S. at 33; *Wang Labs., Inc. v Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997); *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577-78 (Fed. Cir. 1993).

**B.    Patent Invalidity.**

"A patent, though presumed valid, 35 U.S.C. § 288 (1988), is actually a fragile entity, and must be propped up by a myriad of supports, each representative of one of the legal requirements of validity. If even a single one of these supports is removed, the patent will fall. For example, a patent may be declared invalid ... if it is found to be anticipated by a prior art reference, *see id.* § 102; if it is rendered obvious by a combination of the prior art, *see id.* § 103; or if it fails to satisfy any one of a number of a variety of other conditions." *Morton Int'l Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1471-72 (Fed. Cir. 1993) (Mayer, J., concurring).

1.    **35 U.S.C. § 102—Anticipation.**

Under § 102, a person shall be entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent," 35 U.S.C. § 102(a), or "the invention was patented or described in a printed publication in this country or a foreign country . . . more than one year prior to the date of the application for patent in the United States," *id.* § 102(b). Furthermore, § 102(e) precludes a patent when the "invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant." 35 U.S.C. § 102(e)(2).

A patent claim is said to be anticipated (*i.e.*, not novel) if a comparison of the claim with a prior art reference reveals that every element of the claim is described, either expressly or inherently, in the prior art reference. *See In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1346 (Fed. Cir. 2002); *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

2.    **35 U.S.C. § 103—Obviousness.**

Under 35 U.S.C. § 103(a), "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Obviousness is ultimately a legal conclusion, based upon underlying factual inquiries. *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1368 (Fed. Cir. 2003). The required factual inquiry asks: (1) what is the level of ordinary skill in the pertinent art; (2) what was the scope and content of the prior art; (3) what are the differences between the prior art and the asserted claims. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). Finally, objective evidence of nonobviousness, *i.e.*, so-called "secondary considerations," is considered where relevant. *See id.* at 17-18; *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

When, from the perspective of a person of ordinary skill in the art, the differences between the prior art and the claimed invention as a whole would be obvious, a *prima facie* case of obviousness is established under §§103, thus rendering the subject claim invalid. *See In re Dillon*, 919 F.2d 688, 692-93 (Fed. Cir. 1990).

Obviousness may be based on one or more references. However, either the prior art as a whole, or knowledge generally available to one of ordinary skill in the art, must suggest the desirability, and thus, the obviousness of combining and modifying the prior art to arrive at the claimed invention. *See SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000). This requirement for a showing of motivation to combine references ensures that a combination is not improperly made in hindsight. *See In re Gartside*, 203 F.3d 1305, 1318-19 (Fed. Cir. 2000). However, it is not necessary that the references be combined for the same reasons as the inventor. *In re Beattie*, 974 F.2d 1309, 1312 (Fed. Cir. 1992) ("As long as some motivation or suggestion to combine the references is provided by the prior art taken as a whole, the law does not require that the references be combined for the reasons contemplated by the inventor.").

## IV.    Factual and Legal Basis for Cobalt's Paragraph IV Certifications.

### A.    The '726 Patent.

The '726 patent issued on December 15, 1998, and was assigned, on its face, to Merck & Co., Inc. ("Merck"). The '726 patent contains seven claims, which read as follows:

1.    A pharmaceutical composition comprising a pharmaceutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

2.    The pharmaceutical composition of claim 1 wherein said anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt is present in the amount of 0.005 to 1.0 gram per gram of composition.

3.    A method for treating and/or preventing bone loss in a subject, comprising administering to said subject in need thereof, the pharmaceutical composition as defined in claim 1.

4.    The method of claim 3, wherein said subject is human.

5.    The method of claim 3, wherein the bone loss is osteoporosis-related, due to disuse, age-related, related to steroid therapy, rheumatoid-related, related to Paget's disease, or related to cancer.

> 6.    The method of claim 3, wherein the treatment is prophylactic.
>
> 7.    The anhydrous form of 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt.

('726 patent at col. 4, lines 42-58).

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 1-7 of the '726 patent, either literally or under the doctrine of equivalents.

## 1.    No Literal Infringement of Claims 1-7.

Claims 1-2 and 7 are all product claims. Specifically, claims 1-2 require a pharmaceutical composition containing, among other things, "anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt." Claim 7 simply requires the "anhydrous form of 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt."

Thus, claims 1-2 and 7 all require the use of "anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt." The plain and ordinary meaning of this term is anhydrous alendronate sodium, which is a particular crystalline form of alendronate sodium that is free from bound water molecules and which necessarily excludes all hydrated forms of the compound, including alendronate sodium trihydrate.

The specification of the '726 patent reinforces this construction by clearly disavowing or disclaiming the prior art trihydrate form of alendronate. In particular, the specification concedes that the trihydrate form was disclosed in prior art U.S. Patent Nos. 4,922,207 and 5,019,651. The specification then distinguishes this form from the allegedly inventive "anhydrous" form by stating that the latter has "desirable crystal habit, good flow ..., high solubility ... and improved bioavailability" compared to the prior art trihydrate form. According to the specification, the allegedly new "anhydrous" form also exhibits a distinctive X-ray powder diffraction pattern. ('726 patent at col. 4, lines 26-27). The specification thus makes clear that the claims are directed solely to the specific anhydrous form of alendronate, and exclude other crystalline forms.

The prosecution history of the '726 patent further confirms this construction. In response to rejections based on prior art disclosing alendronate sodium, the patentees emphasized that their invention "relates to the anhydrous alendronate monosodium salt" and that the prior art "fails to teach or suggest the anhydrous form of alendronate." ('726 patent PH, 7/20/1998 Response at 2 (emphasis in original)). Once again, the patentees made clear that the claims cover only anhydrous alendronate sodium, and not any other form.

In sum, properly construed in view of the intrinsic evidence, the claims must be interpreted to require anhydrous alendronate sodium, and to exclude all other crystalline forms of the compound, in particular hydrated forms like alendronate sodium trihydrate.

Here, Cobalt's ANDA Product does not contain or employ anhydrous alendronate sodium or any equivalent thereof.

For at least this reason, Cobalt's ANDA product would not literally infringe claims 1-2 and 7 of the '726 patent.

Claims 3-6 are method of treatment claims directed to the use or administration of "anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt," *i.e.,* anhydrous alendronate sodium.

As an initial matter, Cobalt would not directly infringe claims 3-6 because Cobalt does not treat, or administer drugs to, patients, and will not directly use or administer any form of alendronate for any of the claimed methods. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 n.7 (Fed. Cir. 2003).

Cobalt would not induce or contribute to infringement of claims 3-6 because the use of Cobalt's ANDA Product by others (i.e., physicians and patients) would not directly infringe these claims. Specifically, Cobalt's ANDA Product does not contain or employ anhydrous alendronate sodium or any equivalent thereof.

For at least these reasons, Cobalt's ANDA product would not literally infringe claims 1-7 of the '726 patent.

### 2.    No Infringement Under the Doctrine of Equivalents.

The commercial manufacture, use, sale, offer for sale or importation of Cobalt's ANDA Product would not infringe claims 1-7 of the '726 patent under the doctrine of equivalents.

The differences between Cobalt's ANDA Product and the anhydrous alendronate recited in these claims are more than insubstantial. The anhydrous alendronate limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain this particular crystalline form of alendronate, since such a scope of equivalents would impermissibly vitiate this limitation and also ensnare the prior art. Merck is also estopped from asserting a range of equivalents that would include compositions that do not contain anhydrous alendronate by virtue of Merck's representations and arguments to the PTO in which it surrendered this subject matter in order to obtain allowance of the claims.

For at least these reasons, Cobalt's ANDA Product would not infringe claims 1-7 of the '726 patent under the doctrine of equivalents.

### B.    The '207 patent.

The '207 patent issued on December 28, 1999, and was assigned, on its face, to Merck. The '207 patent contains four claims, which read as follows:

1.    A method for treating bone resorption in a mammal in need thereof comprising administering to said mammal a

-7-

therapeutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

2.    A method for preventing bone resorption in a mammal in need thereof comprising administering to said mammal a therapeutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

3.    A method for inhibiting bone resorption in a mammal in need thereof comprising administering to said mammal a therapeutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

4.    A method for promoting bone growth in a mammal in need thereof comprising administering to said mammal a therapeutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

('207 patent at col. 4, lines 39-58; Certificate of Correction).

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe any of claims 1-4 of the '207 patent, either literally or under the doctrine of equivalents.

**1.    No Literal Infringement of Claims 1-4.**

Claims 1-4 are method-of-use claims directed to a particular method of using or administering "anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt." For the reasons already discussed in Section IV(A)(1), above, which are incorporated by reference herein, this term must be interpreted to mean anhydrous alendronate sodium, and to exclude all other crystalline forms of the compound, in particular hydrated forms like alendronate sodium trihydrate.

As an initial matter, Cobalt would not directly infringe claims 1-4 because Cobalt does not treat, or administer drugs to, patients, and will not directly use or administer any form of alendronate for the claimed methods. *See Warner-Lambert*, 316 F.3d at 1363 n.7.

Cobalt would not induce or contribute to infringement of claims 1-4 for the same reasons that Cobalt would not literally infringe the '726 patent, which are fully incorporated by reference herein. Specifically, Cobalt's ANDA Product does not contain or employ anhydrous alendronate sodium or any equivalent thereof.

-8-

For at least this reason, Cobalt's ANDA Product would not literally infringe claims 1-4 of the '207 patent.

### 2. No Infringement Under the Doctrine of Equivalents.

Cobalt's ANDA Product would not infringe claims 1-4 of the '207 patent under the doctrine of equivalents for the same reasons that Cobalt would not infringe the '726 patent under the doctrine of equivalents, which are fully incorporated by reference herein.

### C. The '329 Patent.

The '329 patent issued on November 30, 1999, and was assigned, on its face, to Merck. The '329 patent contains forty-four claims, which read as follows:

> 1. A method for inhibiting bone resorption in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

> 2. A method according to claim 1 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

> 3. A method according to claim 2 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

> 4. A method according to claim 3 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

> 5. A method according to claim 2 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

> 6. A method according to claim 4 wherein said mammal is a human.

> 7. A method according to claim 6 wherein said dosing interval is once-weekly.

-9-

8.      A method according to claim 7 wherein said unit dosage of said bisphosphonate comprises from about 17.5 mg to about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

9.      A method according to claim 8 wherein said unit dosage of said bisphosphonate comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

10.     A method according to claim 6 wherein said dosing interval is twice-weekly.

11.     A method according to claim 10 wherein said unit dosage of said bisphosphonate comprises from about 8.75 mg to about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

12.     A method according to claim 6 wherein said dosing interval is biweekly.

13.     A method according to claim 12 wherein said unit dosage of said bisphosphonate comprises from about 35 mg to about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

14.     A method according to claim 6 wherein said dosing interval is twice-monthly.

15.     A method according to claim 14 wherein said unit dosage of said bisphosphonate comprises about 35 mg to about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

16.     A method for treating osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

17.     A method according to claim 16 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

-10-

18.    A method according to claim 17 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

19.    A method according to claim 18 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

20.    A method according to claim 17 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

21.    A method according to claim 19 wherein said mammal is a human.

22.    A method according to claim 21 wherein said dosing interval is once-weekly.

23.    A method according to claim 22 wherein said unit dosage of said bisphosphonate comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

24.    A method according to claim 21 wherein said dosing interval is twice-weekly.

25.    A method according to claim 24 wherein said unit dosage of said bisphosphonate comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

26.    A method according to claim 21 wherein said dosing interval is biweekly.

27.    A method according to claim 26, wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

28.    A method according to claim 21 wherein said dosing interval is twice-monthly.

29.    A method according to claim 28 wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

-11-

30.    A method for preventing osteoporosis in a mammal in need thereof comprising orally administering to said mammal a pharmaceutically effective amount of a bisphosphonate as a unit dosage according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

31.    A method according to claim 30 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

32.    A method according to claim 31 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

33.    A method according to claim 32 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

34.    A method according to claim 31 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

35.    A method according to claim 33 wherein said mammal is a human.

36.    A method according to claim 35 wherein said dosing interval is once-weekly.

37.    A method according to claim 36 wherein said bisphosphonate unit dosage comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

38.    A method according to claim 35 wherein said dosing interval is twice-weekly.

39.    A method according to claim 38 wherein said bisphosphonate unit dosage comprises about 17.5 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

40.    A method according to claim 35 wherein said dosing interval is biweekly.

41.    A method according to claim 40 wherein said bisphosphonate unit dosage comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

42.    A method according to claim 35 wherein said dosing interval is twice-monthly.

43.    A method according to claim 42 wherein said bisphosphonate unit dosage comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

44.    A kit comprising at least one pharmaceutically effective unit dosage of a bisphosphonate for oral administration according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

('329 patent at cols. 20-22).

1.    **Merck is Estopped from Asserting the Validity of Claims 16-19, 21-23, 30-33, and 35-37.**

Merck is estopped from asserting the validity of claims 16-19, 21-23, 30-33, and 35-37 against Cobalt.

In *Merck & Co., Inc. v. Teva Pharmaceuticals, USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), *petition for rehearing and rehearing en banc denied*, No. 04-1005, 2005 WL 913484, *1 (Fed. Cir. Apr. 21, 2005), the United States Court of Appeals for the Federal Circuit held that claims 23 and 37 of the '329 patent are invalid for obviousness. *See id.* at 1366 (vacating judgment of district court and holding claims 23 and 37 "invalid and not infringed"). Having fully litigated those claims in prior litigation where invalidity of such claims was essential to final judgment, Merck is forever estopped from asserting the validity of those claims against Cobalt or others. *See Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 1434, 1445 (1971) (holding that patentee is estopped from asserting the validity of a patent that has been declared invalid in prior suit in federal court against a different defendant); *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 713 (Fed. Cir. 1983) ("Under *Blonder-Tongue*, a patentee may be estopped from asserting the validity of his patent if in a previous action his patent was held invalid."); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1380 (Fed. Cir. 1999) (finding that the district court did not err in applying collateral estoppel based on judgment of invalidity and unenforceability in previous suit).

Moreover, collateral estoppel applies to render unlitigated patent claims invalid where "the issues bearing on validity . . . are substantively the same." *Bourns, Inc. v. United States*, 537 F.2d 486, 493 (Ct. Cl. 1976) (finding collateral estoppel applied to preclude litigation

-13-

of claims not previously litigated where issues relevant to a determination of nonobviousness were substantially identical to issues adjudicated in prior suit). "To assess the identity of the issues, it is convenient to compare the adjudicated and unadjudicated claims." *Id.* "Where the differences revealed by a comparison of the claims do not vary the relevant issues bearing on obviousness, collateral estoppel should apply." *Id.*

> [M]erely because the invention, the patentee's contribution to the art, is presented in varying language or varying combinations of elements does not necessarily mean that the issues bearing on the nonobviousness of that concept or contribution vary from one claim to the next. That each of several differently worded claims may present identical issues is apparent from the rather common practice of selecting representative claims and stipulating that the validity of a group of a claims may be determined on the basis of the representative claims.

*Id.* at 492 (citations omitted); *see also Jervis B. Webb Co. v. Southern Sys., Inc.,* 742 F.2d 1388, 1399 (Fed. Cir. 1984) ("A judgment . . . that adjudicated less than all of a patentee's claims may operate as collateral estoppel under certain circumstances to prevent that patentee from later charging the alleged infringer or a third party with infringement of the nonasserted claims.")

Here, invalid claim 23 depends, either directly or indirectly, from claims 16-19 and 21-22, and therefore incorporates all of the limitations of those claims. Likewise, invalid claim 37 depends, either directly or indirectly, from claims 30-33 and 35-36, and therefore incorporates all of the limitations of those claims. As such, claims 16-19, 21-22, 30-33, and 35-36 contain all of the same elements that the Federal Circuit already determined were obvious in view of the prior art in *Merck.* 395 F.3d at 1366. The issues bearing on invalidity and obviousness are necessarily identical given that adjudicated invalid claims 23 and 37 necessarily include all of the elements from unadjudicated claims 16-19, 21-22, 30-33, and 35-36. Thus, Merck is estopped from asserting the validity of unadjudicated claims 16-19, 21-22, 30-33, and 35-36 as well.

For at least these reasons, Merck is estopped from asserting the validity of claims 16-19, 21-23, 30-33, and 35-37 against Cobalt.

### 2.      Invalidity of Claims 1-4, 6-9, and 44.

Claims 1-4, 6-9, and 44 are invalid for anticipation under 35 U.S.C. §§ 102(a) and (b) or, alternatively, are invalid for obviousness under 35 U.S.C. § 103 over several prior art references, including *Update: Bisphosphonate,* LUNAR NEWS (July 1996) ("*Lunar News*") and U.S. Patent No. 5,366,965 ("the Boehringer patent"), which issued November 22, 1994. Both references constitute prior art under 35 U.S.C. §§ 102 and 103.

*Lunar News* relates in general to the use of bisphosphonates, and in particular to once-weekly dosing of 40 mg or 80 mg of alendronate and/or its sodium salt, for the treatment or prevention of osteoporosis. Specifically, *Lunar News* discloses that alendronate had become the current leader in dealing with osteoporosis, but that "U.S. physicians are reluctant to treat

-14-

[patients with alendronate] because of: (a) side effects, (b) difficulty of dosing, and (c) high costs ….." (*Lunar News* at 23). One specific example cited was for elderly women, who were able to tolerate the dosing regime "for only [a] week or two." (*Id.*) *Lunar News* proposed a solution to this problem, however: "oral alendronate potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs." (*Id.*)

The Boehringer patent discloses a method for treating or preventing osteoporosis. (Boehringer patent, Abstract). The Boehringer patent specifically identifies bisphosphonates as the class of compounds found to inhibit bone resorption. (*Id.* at col. 1, lines 24-26). The "[p]referred modes of administration of polyphosphonates in accordance with the present invention include oral, intravenous and subcutaneous." (*Id.* at col. 4, lines 63-65). Finally, the Boehringer patent teaches that to increase patient compliance in taking bisphosphonates:

> It is easier to concentrate on the correct drug intake for example only once a week. Additionally, bisphosphonates can cause intestinal discomfort. It is important to have these problems as rare as possible.

(*Id.* at col. 10, line 62–col. 11, line 2; *see also id.* at col. 11, lines 40-47 (calling for administering polyphosphonate in at least two cycles of drug administration periods between 2-14 days in duration, with the drug being administered on only one day of each cycle); *see also* col. 12, lines 43-48 (requiring two week period where drugs are administered every seven days)).

The Boehringer patent further teaches that the invention not only "relates to methods of treating or preventing osteoporosis," but also "to a kit to be used by patients" during such treatment. (Boehringer patent at col. 1, lines 6-13).

Claims 1-4, 6-9, and 44 are invalid for anticipation and/or obviousness in view of these prior art references.

### a.    Claim 1.

Claim 1 recites the following elements:

- A method for inhibiting bone resorption

- in a mammal in need thereof comprising

- orally administering to said mammal

- a pharmaceutically effective amount of a bisphosphonate as a unit dosage

- according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

-15-

*Lunar News* expressly discloses each of these elements.

First, *Lunar News* specifically states that bisphosphonates "inhibit bone resorption." (*Lunar News* at 23). Second, *Lunar News* discloses the use of bisphosphonates in humans, *i.e.*, mammals. (*Id.*) Third, *Lunar News* reports that bisphosphonates may be taken orally, and further indicates that bioavailability may be hindered because it must be taken on an empty stomach. (*Id.*) Fourth, *Lunar News* states that "oral alendronate potentially could be given in a 40 or 80 mg dose once/week," which anticipates the "pharmaceutically effective amount" limitation. (*Id.*) The specification of the '329 patent describes an effective amount as "from about 8.75 mg to about 140 mg." The disclosure in *Lunar News* falls comfortably within this range. And finally, *Lunar News* expressly teaches once-weekly dosing of alendronate. (*Id.*) As the Federal Circuit in *Merck* concluded, absent the specific dosage limitations appearing in later claims of the '329 patent, "the *Lunar News* articles would anticipate ... under section 102." *Merck*, 395 F.3d at 1375.

For at least these reasons, claim 1 is invalid for anticipation under 35 U.S.C. § 102.

### b.    Claim 2.

Claim 2 is identical to claim 1, except the bisphosphonate must be "selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." As discussed above for claim 1, *Lunar News* discloses the use of such bisphosphonates, including alendronate.

For at least the reasons discussed above for claim 1, which are incorporated by reference herein, claim 2 is invalid for anticipation under 35 U.S.C. § 102.

### c.    Claim 3.

Claim 3 is identical to claim 2, except the bisphosphonate must be "selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." Once again, *Lunar News* expressly discloses the use of alendronate.

For at least the reasons discussed above for claims 1-2, which are incorporated by reference herein, claim 3 is invalid for anticipation under 35 U.S.C. § 102.

### d.    Claim 4.

Claim 4 is identical to claim 3, except the bisphosphonate must be "alendronate monosodium trihydrate." Once again, *Lunar News* discloses this element. In particular, *Lunar News* expressly refers to Merck's alendronate, which is alendronate sodium trihydrate.

For at least the reasons discussed above for claims 1-3, which are incorporated by reference herein, claim 4 is invalid for anticipation under 35 U.S.C. § 102.

-16-

####    e.    Claim 6.

Claim 6 is identical to claim 4, except the mammal undergoing treatment must be human. *Lunar News* expressly discloses the use of bisphosphonates, in particular alendronate, by humans.

For at least the reasons discussed above for claims 1-4, which are incorporated by reference herein, claim 6 is invalid for anticipation under 35 U.S.C. § 102.

####    f.    Claim 7.

Claim 7 is identical to claim 6, except the dosing regimen is once-weekly. *Lunar News* expressly refers to the dosing of alendronate in humans "in a 40 or 80 mg dose once/week," *i.e.*, once-weekly.

For at least the reasons discussed above for claims 1-4 and 6, which are incorporated by reference herein, claim 7 is invalid for anticipation under 35 U.S.C. § 102.

####    g.    Claim 8.

Claim 8 is identical to claim 7, except the dose must be "from about 17.5 mg to about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis." *Lunar News* discloses a 40 mg dose once-weekly, which falls well within the claimed range.

For at least the reasons discussed above for claims 1-4 and 6-7, which are incorporated by reference herein, claim 8 is invalid for anticipation under 35 U.S.C. § 102.

####    h.    Claim 9.

Claim 9 is identical to claim 8, except the dose must be "about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis." As the Federal Circuit recognized in *Merck*, the dosing level in the '329 patent "differs from the disclosure in the *Lunar News* articles only in terms of a minor difference in the dosage." *Merck*, 395 F.3d at 1375. The court therefore concluded that "[t]here was no great leap required of those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week," as called for by the '329 patent claims. *See id.* at 1373. The Federal Circuit also rejected Merck's purported evidence of nonobvious, holding, for example, that Merck's evidence of commercial success was "weak." *Id.* at 1377.

For at least these reasons and those discussed above for claims 1-4 and 6-8, which are incorporated by reference herein, claim 9 is either invalid for inherent anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

####    i.    Claim 44.

Claim 44 requires the following elements:

* A kit comprising

-17-

- at least one pharmaceutically effective unit dosage of a bisphosphonate

- for oral administration

- according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

As noted above for claims 1-4 and 6-9, *Lunar News* expressly discloses the final three elements of this claim. The only remaining element is the "kit" requirement.

If the term "kit" is broadly construed to mean any pharmaceutical composition, then this element is either expressly or inherently anticipated by *Lunar News*. For at least that reason, claim 44 is invalid for anticipation based on *Lunar News* under 35 U.S.C. § 102.

If the term "kit" is more narrowly construed to require some sort of special packaging or blister package for the drug product, claim 44 is obvious in view of *Lunar News* and the knowledge of a person of ordinary skill in the art and therefore invalid under 35 U.S.C. § 103.

Lastly, if the term "kit" is construed even more narrowly to mean some sort of compliance packaging that would assist patients with complying with a certain dosing schedule, claim 44 is anticipated by, or obvious in view of, the Boehringer patent.

The Boehringer patent teaches that bisphosphonates inhibit bone resorption. (Boehringer patent at col. 1, lines 24-26). Furthermore, the "[p]referred modes of administration of polyphosphonates in accordance with the present invention include oral, intravenous and subcutaneous." (*Id.* at col. 4, lines 63-65; *see also id.* at col. 5, line 61-65 (noting that a sugar pill can serve as a placebo during rest periods)). The Boehringer patent also teaches that to increase patient compliance in taking bisphosphonates:

> It is easier to concentrate on the correct drug intake for example only once a week. Additionally, bisphosphonates can cause intestinal discomfort. It is important to have these problems as rare as possible.

(*Id.* at col. 10, line 62–col. 11, line 2; *see also id.* at col. 11, lines 40-47 (calling for administering polyphosphonate in at least two cycles of drug administration periods between 2-14 days in duration, with the drug being administered on only one day of each cycle) and at col. 12, lines 43-48 (requiring two week period where drugs are administered every seven days)).

The Boehringer patent further discloses "a kit to be used by patients" during treatment with bisphosphonates. (Boehringer Patent at col. 1, lines 11-13). The Boehringer patent provides a detailed description of the features of these kits, which include:

-18-

- "a number of unit dosages"

- indications "beside each dosage the date on which that dosage should be administered";

- "a card having the components of the treatment regimen in the order of their intended use," with an "example of such a card [being] a 'blister pack.'";

- "a memory aid on the card, e.g., in the form of numbers adjacent to the dosages, which numbers correspond to the days in the regimen in which the dosages should be administered, e.g., the date."

- a specific example of three intermittent dosing periods "each seven days long."

(*Id.* at col. 6, lines 25-65).

Thus, if the term "kit" is construed to mean some type of special patient compliance packaging for the drug, the Boehringer patent discloses each and every element of claim 44, either expressly or inherently, or in conjunction with *Lunar News*.

For at least these reasons, under any construction, claim 44 is invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### 3.    Noninfringement of Claims 5, 10-15, 20, 24-29, 34 and 38-43.

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 5, 10-15, 20, 24-29, 34 and 38-43 of the '329 patent, either literally or under the doctrine of equivalents.

#### a.    No Literal Infringement.

Claims 5, 10-15, 20, 24-29, 34 and 38-43 are all method of use or treatment claims directed to the use or administration of bisphosphonates.

As an initial matter, Cobalt would not directly infringe claims 5, 10-15, 20, 24-29, 34, and 38-43 because Cobalt does not treat, or administer drugs to, patients, and will not directly use or administer any bisphosphonate for any of the claimed methods. *See Warner-Lambert Co.*, 316 F.3d at 1363 n.7.

Cobalt would not induce or contribute to the infringement of claims 5, 10-15, 20, 24-29, 34, and 38-43, either because the use of Cobalt's ANDA Product by others (*i.e.*, physicians and patients) would not directly infringe these claims.

Claims 5, 20 and 34 require the use of "risedronate." This compound is an entirely different bisphosphonate from alendronate. Unlike alendronate, the claimed risedronate

-19-

(having the chemical name 1-hydroxy-2-[3-pyridyl] ethylidene-1,1-bisphosphonic acid) contains a pyridyl functional group as well as an ethyl ($C_2H_3$-) functional group in its base structure that are not present in alendronate.

Here, Cobalt's ANDA Product does not contain or employ risedronate or any equivalent compound. For at least this reason, Cobalt's ANDA product would not literally infringe claim 5, 20 and 34.

Claims 10-11, 24-25, and 38-39 all require "twice-weekly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for twice-weekly dosing; and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product twice-weekly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 10-11, 24-25, and 38-39. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990).

Claims 12-13, 26-27, and 40-41 require "biweekly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for biweekly dosing, and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product biweekly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 12-13, 26-27, and 40-41. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

Claims 14-15, 28-29, and 42-43 require "twice-monthly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for twice monthly dosing, and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product twice-monthly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Furthermore, Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 14-15, 28-29, and 42-43. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

**b.   No Infringement Under the Doctrine of Equivalents.**

The commercial manufacture, use, sale, offer for sale or importation of Cobalt's ANDA Product would not infringe claims 5, 10-15, 20, 24-29, 34 and 38-43 under the doctrine of equivalents.

The differences between Cobalt's alendronate once weekly and once-daily ANDA Product and the products (*e.g.* risedronate) and dosing schedules (*e.g.*, twice-weekly, biweekly, and twice-monthly) recited in claims 5, 10-15, 20, 24-29, 34 and 38-43 are more than insubstantial. The particular compound and/or dosing limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain the particular claimed compound and/or that are not intended for the claimed dosing, since such a scope of equivalents would impermissibly vitiate these limitations altogether.

For at least these reasons, Cobalt's ANDA Product would not infringe claims 5, 10-15, 20, 24-29, 34 and 38-43 under the doctrine of equivalents.

**D.     The '801 Patent.**

The '801 patent issued on January 18, 2000, and was assigned, on its face, to Merck. The patent contains fifty-nine claims, which read as follows:

> 1.     A method for treating a condition or disease state in a mammal, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a bisphosphonate according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

> 2.     A method according to claim 1 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zolendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

> 3.     A method according to claim 2 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

> 4.     A method according to claim 3 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

> 5.     A method according to claim 2 wherein said bisphosphonate is selected from the group consisting of

risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

6.      A method according to claim 4 wherein said mammal is a human.

7.      A method according to claim 6 wherein said dosing interval is once-weekly.

8.      A method according to claim 7 wherein said unit dosage of said bisphosphonate comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

9.      A method according to claim 6 wherein said dosing interval is twice-weekly.

10.     A method according to claim 8 wherein said unit dosage of said bisphosphonate comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

11.     A method according to claim 6 wherein said dosing interval is biweekly.

12.     A method according to claim 11 wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

13.     A method according to claim 6 wherein said dosing interval is twice-monthly.

14.     A method according to claim 13 wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

15.     A method for preventing a condition or disease state in a mammal in need thereof, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a bisphosphonate according to a continuous schedule having a dosing interval selected from the group

-22-

consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

16.    A method according to claim 15 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zolendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

17.    A method according to claim 16 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

18.    A method according to claim 17 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

19.    A method according to claim 16 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

20.    A method according to claim 18 wherein said mammal is a human.

21.    A method according to claim 20 wherein said dosing interval is once-weekly.

22.    A method according to claim 21 wherein said unit dosage of said bisphosphonate comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

23.    A method according to claim 20 wherein said dosing interval is twice-weekly.

24.    A method according to claim 23 wherein said unit dosage of said bisphosphonate comprises about 17.5 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

25.    A method according to claim 20 wherein said dosing interval is biweekly.

26.    A method according to claim 25 wherein said unit dosage of said bisphosphonate comprises about 70 mg of

-23-

alendronate monosodium trihydrate, on an alendronic acid active basis.

27.     A method according to claim 20 wherein said dosing interval is twice-monthly.

28.     A method according to claim 27 wherein said unit dosage of said bisphosphonate comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

29.     A method for treating a condition or disease state in a mammal, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising sequentially orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a histamine H2 receptor blocker or a proton pump inhibitor and a unit dosage of a bisphosphonate according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

30.     A method according to claim 21 wherein said histamine H2 blocker or said proton pump inhibitor is administered from about 30 minutes to about 24 hours prior to the administration of said bisphosphonate.

31.     A method according to claim 30 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zolendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

32.     A method according to claim 31 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

33.     A method according to claim 32 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

34.     A method according to claim 31 wherein said bisphosphonate is selected from the group consisting of

-24-

risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

35.    A method according to claim 33 wherein said mammal is a human.

36.    A method according to claim 35 wherein said dosing interval is once-weekly.

37.    A method according to claim 36 wherein said unit dosage of said bisphosphonate comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

38.    A method according to claim 35 wherein said dosing interval is twice-weekly.

39.    A method according to claim 38 wherein said unit dosage of said bisphosphonate comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

40.    A method according to claim 35 wherein said dosing interval is biweekly.

41.    A method according to claim 39 wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

42.    A method according to claim 35 wherein said dosing interval is twice-monthly.

43.    A method according to claim 42 wherein said unit dosage of said bisphosphonate comprises about 140 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

44.    A method for preventing a condition or disease state in a mammal in need thereof, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising sequentially orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a histamine H2 receptor blocker or a proton pump inhibitor and a unit dosage of a bisphosphonate according to

-25-

a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

45.     A method according to claim 44 wherein said histamine H2 receptor blocker or said proton pump inhibitor is administered from about 30 minutes to about 24 hours prior to the administration of said bisphosphonate.

46.     A method according to claim 45 wherein said bisphosphonate is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zolendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

47.     A method according to claim 46 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

48.     A method according to claim 47 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

49.     A method according to claim 46 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

50.     A method according to claim 48 wherein said mammal is a human.

51.     A method according to claim 50 wherein said dosing interval is once-weekly.

52.     A method according to claim 51 wherein said bisphosphonate unit dosage comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

53.     A method according to claim 50 wherein said dosing interval is twice-weekly.

54.     A method according to claim 53 wherein said bisphosphonate unit dosage comprises about 17.5 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

55.     A method according to claim 50 wherein said dosing interval is biweekly.

56.     A method according to claim 55 wherein said bisphosphonate unit dosage comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

57.     A method according to claim 50 wherein said dosing interval is twice-monthly.

58.     A method according to claim 57 wherein said bisphosphonate unit dosage comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis.

59.     A method according to any one of claims 29-58 wherein said histamine H2 receptor blocker or proton pump inhibitor is selected from the group consisting of cimetidine, famotidine, nizatidine, ranitidine, omprazole [sic., omeprazole], and lansoprazole.

('801 patent at cols. 20-24).

1.      **Invalidity of Claims 1-4, 6-8, 10, 15-18, and 20-22.**

Claims 1-4, 6-8, 15-18 and 20-22 of the '801 patent are invalid for anticipation under 35 U.S.C. § 102(a) and (b) and/or obviousness under 35 U.S.C. § 103 based on the same *Lunar News* article discussed above for the '329 patent.

a.      **Claim 1.**

Claim 1 requires the following elements:

- A method for treating a condition or disease state in a mammal, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma,

- orally administering to a mammal

- a pharmaceutically effective amount of a bisphosphonate as a unit dosage

- according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

Each and every element of claim 1 is expressly found in the *Lunar News*.

Specifically, the claim lists a series of diseases or conditions including bone fractures. *Lunar News* teaches that bisphosphonates "inhibit bone resorption." (*Lunar News* at 23). It also observes that treatment with alendronate halves the vertebral fracture rate, and "non-vertebral fractures decrease by 20%." (*Id.*) *Lunar News* also discloses the use of bisphosphonates in humans, who are mammals, and further reports that bisphosphonates may be taken orally. (*Id.*) Furthermore, the fourth element, a pharmaceutically effective amount of a bisphosphonate, is also disclosed. The specification of the '801 patent identifies as an effective amount a range "from about 8.75 mg to about 140 mg." ('801 patent at col. 13, line 30-33). *Lunar News* reports that "oral alendronate potentially could be given in a 40 or 80 mg dose once/week," which fulfills the effective amount range. (*Lunar News* at 23). Finally, *Lunar News* discloses once-weekly dosing. (*Id.*)

In sum, *Lunar News* expressly discloses each and every element of claim 1. For at least this reason, claim 1 is invalid for anticipation under 35 U.S.C. § 102.

### b.    Claim 2.

Claim 2 is identical to claim 1, except the bisphosphonate must be "selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." *Lunar News* expressly teaches that "oral *alendronate* potentially could be given in a 40 or 80 mg dose once/week to avoid dosing problems and reduce costs." (*Lunar News* at 23 (emphasis added)).

For at least these reasons and those discussed above for claim 1, which are incorporated by reference herein, claim 2 is invalid for anticipation under 35 U.S.C. § 102.

### c.    Claim 3.

Claim 3 is identical to claim 2, except the bisphosphonate must be "selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." Once again, however, *Lunar News* expressly discloses the use of alendronate.

For the same reasons discussed above for claims 1-2, which are incorporated by reference herein, claim 3 is invalid for anticipation under 35 U.S.C. § 102.

### d.    Claim 4.

Claim 4 is identical to claim 3, except the bisphosphonate must be "alendronate monosodium trihydrate." *Lunar News* discloses the use of Merck's alendronate, which is "alendronate monosodium trihydrate."

For at least these reasons and those discussed above for claims 1-3, which are incorporated by reference herein, claim 4 is invalid for anticipation under 35 U.S.C. § 102.

-28-

### e.    Claim 6.

Claim 6 is identical to claim 4, except the mammal undergoing treatment must be human.

For at least the reasons discussed above for claims 1-4, which are incorporated by reference herein, claim 6 is invalid for anticipation under 35 U.S.C. § 102.

### f.    Claim 7.

Claim 7 is identical to claim 6, except the dosing regimen is once weekly.

For at least the reasons discussed above for claims 1-4 and 6, which are incorporated by reference herein, claim 7 is invalid for anticipation under 35 U.S.C. § 102.

### g.    Claim 8.

Claim 8 is identical to claim 7, except the dosage "comprises about 70 mg of alendronate monosodium trihydrate, on an alendronic acid active basis." While the 70 mg limitation is not literally disclosed in *Lunar News*, this limitation is obvious in view of the Federal Circuit's decision in *Merck*. In determining the validity of claim 37 of the '329 patent (reciting a 70 mg dosage as well), the Federal Circuit held that "[t]here was no great leap required of those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week." *Merck*, 395 F.3d at 1377. The court therefore found that the 70 mg dosage was obvious. *See id.* For the same reason, the 70 mg limitation here is obvious in view of the 80 mg disclosure in *Lunar News*.

For at least these reasons, claim 8 is invalid for obviousness under 35 U.S.C. § 103.

### h.    Claim 10.

Claim 10 is identical to claim 8, except the dosage "comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis." Although the 35 mg limitation is not literally disclosed in *Lunar News*, this limitation is also obvious in view of the Federal Circuit's decision in *Merck*. In determining the validity of claim 23 of the '329 patent (reciting a 35 mg dosage as well), the Federal Circuit held that "[t]here was no great leap required of those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week." *Merck*, 395 F.3d at 1377. The court therefore found that the 35 mg dosage was obvious. *See id.* For the same reason, the 35 mg limitation here is obvious in view of the 40 mg disclosure in *Lunar News*.

For at least these reasons, claim 10 is invalid for obviousness under 35 U.S.C. § 103.

### i.    Claim 15.

Claim 15 requires the following elements:

- A method for preventing a condition or disease state in a mammal, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma,

- orally administering to a mammal

- a pharmaceutically effective amount of a bisphosphonate as a unit dosage

- according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

These elements are identical to those found in claim 1, with the sole difference focusing on "prevention" rather than "treatment" of the listed diseases and conditions. *Lunar News* expressly discloses that bisphosphonates can be taken to promote bone strength, which, in turn, prevents bone disease.

For at least these reasons and those discussed above for claim 1, which are incorporated by reference herein, claim 15 invalid for anticipation under 35 U.S.C. § 102.

### j.    Claims 16-18.

Claim 16 is identical to claim 15, except the bisphosphonate must be "selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." Claim 17 is identical to claim 16, except the bisphosphonate must be "selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." And claim 18 is identical to claim 17, except the bisphosphonate must be "alendronate monosodium trihydrate."

For at least the reasons discussed above for claims 1-4 and 15, which are incorporated by reference herein, claims 17-19 are invalid for anticipation under 35 U.S.C. § 102.

### k.    Claim 20.

Claim 20 is identical to claim 18, except the mammal undergoing treatment must be human.

For at least the reasons discussed above for claims 1-4, 6-7, and 15-18, which are incorporated by reference herein, claim 20 is invalid for anticipation under 35 U.S.C. § 102.

l.      **Claim 21.**

Claim 21 is identical to claim 20, except the dosing regimen is once-weekly.

For at least the reasons discussed above for claims 1-4, 6-7, and 15-18, and 20, which are incorporated by reference herein, claim 21 is invalid for anticipation under 35 U.S.C. § 102.

m.      **Claim 22.**

Claim 22 is identical to claim 21, except the dosage "comprises about 35 mg of alendronate monosodium trihydrate, on an alendronic acid active basis."

For at least the reasons discussed above for claims 1-4, 6-8, and 16-18, and 20-21, which are incorporated by reference herein, claim 22 is invalid for obviousness under 35 U.S.C. § 103.

2.      **Noninfringement of Claims 5, 9, 11-14, 19, and 23-59.**

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 5, 9, 11-14, 19, and 23-59 of the '801 patent, either literally or under the doctrine of equivalents.

a.      **No Literal Infringement.**

Claims 5, 9, 11-14, 19, and 23-59 are all method of use or treatment claims directed to the use or administration of bisphosphonates.

As an initial matter, Cobalt would not directly infringe claims 5, 9, 11-14, 19, and 23-59 because Cobalt does not treat, or administer drugs to, patients, and will not directly use or administer any bisphosphonate for any of the claimed methods. *See Warner-Lambert*, 316 F.3d at 1363 n.7.

Cobalt would not induce or contribute to infringement of claims 5, 9, 11-14, 19, and 23-59 either because the use of Cobalt's ANDA Product by others (*i.e.*, physicians and patients) would not directly infringe these claims.

Claims 5 and 19 both require the use of "risedronate." This compound is an entirely different bisphosphonate from alendronic acid. Unlike alendronate the claimed risedronate (the free acid having the chemical name 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid) contains a pyridyl functional group as well as an ethyl ($C_2H_3$-) functional group in its base structure that are not present in alendronate.

Here, Cobalt's ANDA Product does not contain or employ risedronate or any equivalent compound. For at least this reason, Cobalt's ANDA product would not literally infringe claims 5 and 19.

-31-

Claims 9 and 23-24 all require "twice-weekly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for twice-weekly dosing, and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product twice-weekly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 9 and 23-24. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

Claims 11-12 and 25-26 all require "biweekly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for biweekly dosing, and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product biweekly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 11-12 and 25-26. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

Claims 13-14 and 27-28 all require "twice-monthly" dosing of a bisphosphonate. Cobalt's ANDA Product is not labeled or intended for twice monthly dosing, and nothing in Cobalt's ANDA or proposed labeling would encourage or induce others to use Cobalt's ANDA Product twice-monthly. Rather, Cobalt's 35 mg and 70 mg alendronate tablets are labeled and intended for once-weekly dosing. Cobalt's 40 mg alendronate tablets are labeled and intended for once-daily dosing for six months.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 13-14 and 27-28. *See Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

Claims 29-59 all require "sequentially orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a histamine H2 receptor blocker or proton pump inhibitor." Cobalt's ANDA Product is not labeled or intended for sequential usage let alone with a histamine H2 receptor blocker or proton pump inhibitor. Rather Cobalt's ANDA Product is labeled for treatment methods requiring the use of alendronate alone.

For at least these reasons, Cobalt would not induce or contribute to infringement of claims 29-59. *Warner-Lambert*, 316 F.3d at 1363-65; *Manville Sales*, 917 F.2d at 554.

b.    **No Infringement Under the Doctrine of equivalents.**

The commercial manufacture, use, sale, offer for sale or importation of Cobalt's ANDA Product would not infringe claims 5, 9, 11-14, 19, and 23-59 under the doctrine of equivalents.

-32-

The differences between Cobalt's alendronate once-weekly and once-daily ANDA Product and the products (*e.g.* risedronate), dosing schedules (*e.g.*, twice-weekly, biweekly, and twice-monthly), and sequential usage (with a histamine H2 receptor or proton pump inhibitor), recited in claims 5, 9, 11-14, 19, and 23-59 are more than insubstantial. The particular compound, dosing limitations, and/or sequential usage requirements of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain the particular claimed compound, that are not intended for the claimed dosing, and/or require sequential usage since such a scope of equivalents would impermissibly vitiate these limitations altogether.

For at least these reasons, Cobalt's ANDA Product would not infringe claims 5, 9, 11-14, 19, and 23-59 under the doctrine of equivalents.

E.     **The '294 Patent.**

1.     **Claims.**

The '294 patent issued on May 1, 2001 and was assigned to Merck. The '294 patent issued with ninety-four (94) claims, which are recited below:

1.     A kit comprising at least one pharmaceutically effective unit dosage of a bisphosphonate selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, for oral administration to a mammal according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

2.     A kit according to claim 1 wherein said mammal is a human.

3.     A kit according to claim 2 wherein said unit dosage of said bisphosphonate comprises from about 1.5 to about 6000 ug/kg body weight.

4.     A kit according to claim 2 wherein said unit dosage of said bisphosphonate comprises from about 10 to about 2000 ug/kg body weight.

5.     A kit according to claim 2 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

-33-

6.    A kit according to claim 5 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

7.    A kit according to claim 6 wherein said pharmaceutically acceptable salt is a sodium salt.

8.    A kit according to claim 7 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

9.    A kit according to claim 3 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

10.    A kit according to claim 9 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium , and ammonium salts.

11.    A kit according to claim 10 wherein said pharmaceutically acceptable salt is a sodium salt.

12.    A kit according to claim 11 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

13.    A kit according to claim 14 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

14.    A kit according to claim 13 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

15.    A kit according to claim 14 wherein said pharmaceutically acceptable salt is a sodium salt.

16.    A kit according to claim 15 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

-34-

17.    A kit according to claim 5 wherein said unit dosage comprises from about 8.75 to about 140 mg of said bisphosphonate on an alendronic acid active basis.

18.    A kit according to claim 17 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

19.    A kit according to claim 18 wherein said pharmaceutically acceptable salt is a sodium salt.

20.    A kit according to claim 19 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

21.    A kit according to claim 2 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

22.    A kit according to claim 21 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

23.    A kit according to claim 22 wherein said pharmaceutically acceptable salt is a sodium salt.

24.    A kit according to claim 3 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

25.    A kit according to claim 24 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

26.    A kit according to claim 25 wherein said pharmaceutically acceptable salt is a sodium salt.

27.    A kit according to claim 4 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

-35-