28.    A kit according to claim 27 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

29.    A kit according to claim 28 wherein said pharmaceutically acceptable salt is a sodium salt.

30.    A kit according to claim 2 wherein said bisphosphonate is selected from the group consisting of ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

31.    A kit according to claim 30 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

32.    A kit according to claim 31 wherein said pharmaceutically acceptable salt is a sodium salt.

33.    A kit according to claim 3 wherein said bisphosphonate is selected from the group consisting of ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

34.    A kit according to claim 33 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

35.    A kit according to claim 34 wherein said pharmaceutically acceptable salt is a sodium salt.

36.    A kit according to claim 4 wherein said bisphosphonate is selected from the group consisting of ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

37.    A kit according to claim 36 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

38.    A kit according to claim 37 wherein said pharmaceutically acceptable salt is a sodium salt.

39.    A kit comprising at least one pharmaceutically effective unit dosage of a bisphosphonate selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, for oral administration to a mammal according to a continuous schedule having a dosing interval of once-weekly dosing.

40.    A kit according to claim 39 wherein said mammal is a human.

41.    A kit according to claim 40 wherein said unit dosage of said bisphosphonate comprises from about 1.5 to about 6000 ug/kg body weight.

42.    A kit according to claim 40 wherein said unit dosage of said bisphosphonate comprises from about 10 to about 2000 ug/kg body weight.

43.    A kit according to claim 40 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

44.    A kit according to claim 43 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

45.    A kit according to claim 44 wherein said pharmaceutically acceptable salt is a sodium salt.

46.    A kit according to claim 45 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

47.    A kit according to claim 41 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

48.    A kit according to claim 47 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

49.    A kit according to claim 48 wherein said pharmaceutically acceptable salt is a sodium salt.

50.    A kit according to claim 49 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

51.    A kit according to claim 42 wherein said bisphosphonate is selected from the group consisting of alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

52.    A kit according to claim 51 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

53.    A kit according to claim 52 wherein said pharmaceutically acceptable salt is a sodium salt.

54.    A kit according to claim 53 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

55.    A kit according to claim 43 wherein said unit dosage comprises from about 8.75 to about 140 mg of said bisphosphonate on an alendronic acid active basis.

56.    A kit according to claim 43 wherein said unit dosage comprises from about 17.5 to about 70 mg of said bisphosphonate on an alendronic acid active basis.

57.    A kit according to claim 56 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

58.    A kit according to claim 57 wherein said pharmaceutically acceptable salt is a sodium salt.

59.    A kit according to claim 58 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

60.    A kit according to claim 56 wherein said unit dosage comprises about 35 mg of said bisphosphonate on an alendronic acid active basis.

61.    A kit according to claim 60 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

62.    A kit according to claim 61 wherein said pharmaceutically acceptable salt is a sodium salt.

63.    A kit according to claim 62 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

64.    A kit according to claim 56 wherein said unit dosage comprises about 70 mg of said bisphosphonate on an alendronic acid active basis.

65.    A kit according to claim 64 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

66.    A kit according to claim 65 wherein said pharmaceutically acceptable salt is a sodium salt.

67.    A kit according to claim 66 wherein said pharmaceutically acceptable salt is alendronate monosodium trihydrate.

68.    A kit according to claim 40 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

69.    A kit according to claim 68 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

70.    A kit according to claim 69 wherein said pharmaceutically acceptable salt is a sodium salt.

71.    A kit according to claim 41 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

72.    A kit according to claim 71 wherein said pharmaceutically acceptable salt is selected from the group

consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

73.    A kit according to claim 72 wherein said pharmaceutically acceptable salt is a sodium salt.

74.    A kit according to claim 42 wherein said bisphosphonate is selected from the group consisting of risedronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

75.    A kit according to claim 74 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

76.    A kit according to claim 75 wherein said pharmaceutically acceptable salt is a sodium salt.

77.    A kit according to claim 40 wherein said bisphosphonate is selected from the group consisting of ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

78.    A kit according to claim 77 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

79.    A kit according to claim 78 wherein said pharmaceutically acceptable salt is a sodium salt.

80.    A kit according to claim 41 wherein said bisphosphonate is selected from the group consisting of ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

81.    A kit according to claim 80 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

82.    A kit according to claim 81 wherein said pharmaceutically acceptable salt is a sodium salt.

83.    A kit according to claim 42 wherein said bisphosphonate is selected from the group consisting of

-40-

ibandronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof.

84.    A kit according to claim 83 wherein said pharmaceutically acceptable salt is selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

85.    A kit according to claim 84 wherein said pharmaceutically acceptable salt is a sodium salt.

86.    A kit according to any one of claims 1-85 wherein said unit dosage form is a tablet or capsule.

87.    A kit according to claim 86 wherein said kit is a blister pack.

88.    A kit according to any one of claims 1-85 wherein said unit dosages are oriented in the order of their intended use.

89.    A kit according to claim 88 wherein said unit dosage form is a tablet or capsule.

90.    A kit according to claim 89 wherein said kit is a blister pack.

91.    A kit according to any one of claim 1-85 wherein said kit comprises a memory aid.

92.    A kit according to claim 88 wherein said kit comprises a memory aid.

93.    A kit according to claim 89 wherein said kit comprises a memory aid.

94.    A kit according to claim 90 wherein said kit comprises a memory aid.

('294 patent at cols. 20-24).

### 2.    Invalidity of Claims 1-20, 39-67 and 86-94.

Claims 1-20, 39-67 and 86-94 are invalid under 35 U.S.C. §§ 102(a) and (b) or, alternatively, for obviousness under 35 U.S.C. § 103 over several prior art references, including *Lunar News* and the Boehringer patent discussed above for the '329 patent.

### a.  Claim 1.

Claim 1 requires the following elements:

- A "kit" comprising

- at least one pharmaceutically effective unit dosage of a bisphosphonate selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof,

- for oral administration to a mammal

- according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

Claim 1 is identical to claim 44 of the '329 patent, except that it requires a bisphosphonate "selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof."

However, as discussed above with respect to claim 2 of the '329 patent, this additional element is found within *Lunar News* by its disclosure of alendronate.

For at least the reasons discussed above with respect to claims 1-2 and 44 of the '329 patent and incorporated by reference herein, under any construction of the "kit" element, claim 1 is invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### b.  Claim 2.

Claim 2 is identical to claim 1, except the mammal undergoing treatment must be human. Both *Lunar News* and the Boehringer patent teach dosing in humans. (*Lunar News* at 23 (discussing administration in elderly patients); Boehringer patent at col. 7, lines 8-10 (noting that kits are designed to improve patient compliance, which includes humans)).

For at least these reasons and the reasons discussed above for claim 1, which are incorporated by reference herein, claim 2 is invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

#### c. Claim 3.

Claim 3 is identical to claim 2, except the dosage of bisphosphonate must be "from about 1.5 to about 6000 µg/kg body weight."

However, *Lunar News* discloses once-weekly dosing of 40 mg or 80 mg, and further references dosing in elderly women. The average woman, according to actuarial tables available at the time of patenting, weighs about 140 lbs, or around 63 kg. (*See* 1983 Metropolitan Life Insurance Co. Weight Chart for Females.) As such, *Lunar News* inherently discloses about 635 µg/kg for the 40 mg dose and about 1270 µg/kg for the 80 mg dose. Both values inherently are well within the "from about 1.5 to about 6000 µg/kg body weight" requirement of claim 3. *See Schering*, 339 F.3d at 1381.

For at least the reasons discussed above for claims 1-2, which are incorporated by reference herein, claim 3 is invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

#### d. Claim 4.

Claim 4 is identical to claim 2, except the dosage of bisphosphonate must be "from about 10 to about 2000 µg/kg body weight." For each of the reasons discussed above for claim 3, the narrower dosing range recited in claim 4 is also anticipated by dosing ranges found within *Lunar News*.

For at least these reasons and the reasons discussed above for claims 1-3, which are incorporated by reference herein, claim 4 is invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

#### e. Claim 5-8.

Claim 5 is identical to claim 2, except the bisphosphonate must be selected from "alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." Claim 6 is identical to 5, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 7 is identical to claim 6, except that it requires alendronate sodium. Claim 8 is identical to claim 7, except that it requires alendronate monosodium trihydrate. However, *Lunar News* expressly discloses alendronate, and in particular Merck's alendronate, which is alendronate monosodium trihydrate.

For at least the reasons discussed above for claims 1-4, which are incorporated by reference herein, claims 5-8 are invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

#### f. Claim 9-12.

Claim 9 is identical to claim 3, except the bisphosphonate must be selected from the group consisting of "alendronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof." Claim 10 is identical to claim 9, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts.

Claim 11 is identical to claim 10, except that it requires alendronate sodium. Claim 12 is identical to claim 3, except that it requires alendronate monosodium trihydrate.

For at least these reasons and the reasons discussed above for claims 1-8, which are incorporated by reference herein, claims 9-12 are invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### g.    Claims 13-16.

Claim 13 is identical to claim 14, except the bisphosphonate must be selected from the group consisting of "alendronate, pharmaceutically acceptable salts or esters thereof; and mixtures thereof." Claim 14 is identical to claim 13, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 15 is identical to claim 14, except that it requires alendronate sodium. Claim 16 is identical to claim 15, except that it requires alendronate sodium trihydrate.

As a preliminary matter, claims 13-16 are all invalid for indefiniteness under 35 U.S.C. § 112. Claim 13 depends on claim 14, which, in turn depends on claim 13. Claims 15-16 both depend on claim 14. None of these purportedly dependent claims depend on an underlying independent claim, as required by § 112. *See also* MPEP § 2173.05(f).

For at least this reason, claims 13-16 are all invalid for indefiniteness under 35 U.S.C. § 112.

Even if claims 13-16 were properly drawn and supported by any of the preceding independent claims, for at least the reasons discussed above for claims 1-12, which are incorporated by reference herein, claims 13-16 would be invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### h.    Claim 17-20.

Claim 17 is identical to claim 5, except that the dosage must be "from about 8.75 to about 140 mg on an alendronic acid active basis." The addition of the "about 8.75 to about 140 mg" unit dosage range as recited in claim 17 is expressly recited within *Lunar News* when it refers to dosing alendronate in humans "in a 40 or 80 mg dose once/week." (*Lunar News* at 23).

Claim 18 is identical to claim 17, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 19 is identical to claim 18, except that it requires alendronate sodium. Claim 20 is identical to claim 19, except that it requires alendronate monosodium trihydrate. *Lunar News* discloses and anticipates all of these additional elements.

For at least the reasons discussed above for claims 1-12, which are incorporated by reference herein, claims 17-20 are invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### i.    Claims 39-55.

Claims 39-55 are identical to claims 1-17, except the dosing must be once-weekly. Both *Lunar News* and the Boehringer patent teach once-weekly dosing.

For at least these reasons and the reasons discussed above for claims 1-17, which are incorporated by reference herein, claims 39-55 are invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### j.    Claim 56-59.

Claim 56 is identical to claim 5, except the dosage must be from about 17.5 to about 70 mg on an alendronic acid active basis. The addition of the "about 17.5 to about 70 mg" unit dosage range as recited in claim 56 is expressly recited within *Lunar News* when it refers to dosing alendronate in humans "in a 40 ... dose once/week." (*Lunar News* at 23).

Claim 57 is identical to claim 56, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 58 is identical to claim 57, except that it requires alendronate sodium. Claim 59 is identical to claim 58, except that it requires alendronate sodium trihydrate. *Lunar News* and the Boehringer patent anticipate all of these elements.

For at least these reasons and the reasons discussed above for claims 1-20 and 39-55, which are incorporated by reference herein, claims 56-59 are invalid for anticipation under 35 U.S.C. § 102 or, in the alternative, invalid for obviousness under 35 U.S.C. § 103.

### k.    Claims 60-63.

Claim 60 is identical to claim 56, except the dosage must be about 35 mg on an alendronic acid active basis. Claim 61 is identical to claim 60, except the alendronate salt must be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 62 is identical to claim 61, except that it requires alendronate sodium. Claim 63 is identical to claim 62, except that it requires alendronate monosodium trihydrate. *Lunar News* expressly refers to dosing alendronate in humans "in a 40 or 80 mg dose once/week." The Federal Circuit concluded that "[t]here was no great leap required of those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week." *Merck*, 395 F.3d at 1373. Nor did secondary considerations support nonobviousness. *Id.* at 1377. Here too, the "about 35 mg" dosage requirement is obvious over the *Lunar News* disclosure of the 40 mg dosage.

For at least these reasons and the reasons discussed above for claims 1-20 and 39-59, which are incorporated by reference herein, claims 60-63 are invalid for obviousness under 35 U.S.C. § 103.

### l.    Claim 64-67.

Claim 64 is identical to claim 56, except the dosage must be about 70 mg on an alendronic acid active basis. Claim 65 is identical to claim 64, except the alendronate salt must

be selected from the group consisting of sodium, potassium, calcium, magnesium, and ammonium salts. Claim 66 is identical to claim 65, except that it requires alendronate sodium. Claim 67 is identical to claim 66, except that it requires alendronate monosodium trihydrate.

*Lunar News* expressly refers to dosing alendronate in humans "in a 40 or 80 mg dose once/week." The Federal Circuit concluded that "[t]here was no great leap required of those skilled in the art to go from 40 or 80 mg once a week, the pills available at the time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week." *Merck*, 395 F.3d at 1373. Nor did secondary considerations support nonobviousness. *Id.* at 1377. Here, the "about 70 mg" dosage is similarly obvious over the *Lunar News* disclosure of the 80 mg dosage.

Therefore for at least these reasons and the reasons discussed above for claims 1-20 and 39-63, which are incorporated by reference herein, claims 64-67 are invalid for obviousness under 35 U.S.C. § 103.

### m.    Claim 86.

Claim 86 is identical to claims 1-85, except the dosage form must be a tablet or capsule. *Lunar News* expressly refers to Merck's alendronate, which is a tablet.

For at least this reason and the reasons discussed above for claims 1-20 and 39-67, which are incorporated by reference herein, claim 86 is invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### n.    Claim 87.

Claim 87 is identical to claim 86, except the kit must be a blister pack. The Boehringer patent expressly discloses and anticipates the blister pack element.

For at least this reason and the reasons discussed above for claim 1-20, 39-67, and 86, which are incorporated by reference herein, claim 87 is invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### o.    Claim 88.

Claim 88 is identical claims 1-85, except the kit must contain unit dosages that "are oriented in the order of their intended use." The Boehringer patent discloses such compliance packaging, including a kit with the following features::

- "a number of unit dosages"

- indications "beside each dosage the date on which that dosage should be administered";

- "a card having the components of the treatment regimen in the order of their intended use," with an "example of such a card [being] a 'blister pack.'"; and

-46-

- "a memory aid on the card, e.g., in the form of numbers adjacent to the dosages, which numbers correspond to the days in the regimen in which the dosages should be administered, e.g., the date."

(Boehringer patent at col. 6, lines 25-65).

For at least the reasons discussed above for claims 1-20, 39-67, and 86-87, which are incorporated by reference herein, claim 88 is invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

**p.    Claim 89.**

Claim 89 is identical to claim 88, except the unit dosage form must be a tablet or capsule.

For at least the reasons discussed above for claims 1-20, 39-67, and 86-88, which are incorporated by reference herein, claim 89 is invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

**q.    Claim 90.**

Claim 90 is identical to claim 89, except the kit must be a blister pack.

For at least the reasons discussed above for claims 1-20, 39-67, and 86-89, which are incorporated by reference herein, claim 90 is invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

**r.    Claims 91-94.**

Claims 91 is identical to claims 1-85, except the kit must include a memory aid. Claim 92 is identical to claim 88, except the kit must include a memory aid. Claim 93 is identical to claim 89, except the kit must include a memory aid. Claim 94 is identical to claim 90, except the kit must include a memory aid. The Boehringer patent expressly teaches a kit with "a memory aid."

For at least the reasons discussed above for claims 1-20, 39-67, and 86-90, which are incorporated by reference herein, claims 91-94 are invalid for anticipation under 35 U.S.C. § 102 or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

**3.    Noninfringement of Claims 21-38 and 68-94.**

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 21-38 and 68-94 of the '294 patent, either literally or under the doctrine of equivalents.

-47-

a.    No Literal infringement.

Claims 21-38 and 68-85 all require a kit that contains a bisphosphonate other than alendronate. Specifically, claims 21-29 and 68-76 all require risedronate. Claims 30-38 and 77-85 all require ibandronate. Because claims 86-94, either directly or indirectly, depend from claims 1-85, each of those claims incorporate the risedronate and ibandronate elements as well.

Both risedronate and ibandronate are entirely different bisphosphonates from alendronate. Unlike alendronate, the claimed risedronate (the free acid having the chemical name 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid) contains a pyridyl functional group as well as an ethyl ($C_2H_3$-) functional group in its base structure that are not provided in alendronic acid. Ibandronate (the free acid having the chemical name 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid) contains a methyl ($CH_3$-) and a pentyl ($C_5H_{11}$-) functional group attached to its amino group as well as a propyl ($C_3H_4$-) functional group in its base structure that are not provided in alendronic acid.

Here, Cobalt's ANDA Product does not contain or employ risedronate or ibandronate or any equivalent compound. For at least these reasons, Cobalt's ANDA Product would not literally infringe claims 21-38 and 68-94.

b.    No Infringement Under the Doctrine of Equivalents.

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 21-38 and 68-94 of the '294 patent under the doctrine of equivalents.

The differences between Cobalt's alendronate ANDA Product and the risedronate and ibandronate products recited in claims 21-38 and 68-94 are more than insubstantial. The particular compound limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain the particular claimed compounds, since such a scope of equivalents would impermissibly vitiate these limitations altogether.

For at least these reasons, Cobalt's ANDA Product would not infringe claims 21-38 and 68-94 under the doctrine of equivalents.

F.    The '941 patent.

The '941 patent issued on October 25, 1994, and was assigned, on its face, to Merck. The patent contains eight claims, which read as follows:

1.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-

-48-

hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salt thereof; and from about 60 to 99.5% by weight of excipients consisting essentially of: anhydrous lactose; microcrystalline cellulose; croscarmallose sodium; and magnesium stearate.

2.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salt thereof; about 10 to 80% by weight of anhydrous lactose; about 5 to 50% by weight of microcrystalline cellulose; about 0.5 to 10% by weight of croscarmallose sodium; and about 0.1 to 5% by weight of magnesium stearate.

3.    The pharmaceutical composition of claim 2 comprising about 0.5 to 25% by weight of the active ingredient, about 30 to 70% by weight of anhydrous lactose; about 30 to 50% by weight of microcrystalline cellulose; about 0.5 to 5% by weight of croscarmallose sodium; and about 0.1 to 2% by weight of magnesium stearate.

4.    The pharmaceutical composition of claim 2 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid.

5.    The pharmaceutical composition of claim 2 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt trihydrate.

6.    The pharmaceutical composition of claim 5 comprising about 1 to 25% by weight of the active ingredient, 4-amino-1-hydroxybutylidene-1,1bisphosphonic acid monosodium salt trihydrate, about 40 to 60% by weight of anhydrous lactose; about 35 to 45% by weight of microcrystalline cellulose; about 0.5

to 2% by weight of croscarmallose sodium; and about 0.1 to 1% by weight of magnesium stearate.

7.     The pharmaceutical composition of claim 5 in the form of a tablet.

8.     The pharmaceutical composition of claim 2 in the form of a tablet.

('941 patent at cols. 6-8; Certificate of Correction).

### 1.     Invalidity of Claims 1-8.

Claims 1-8 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, are invalid for obviousness under 35 U.S.C. § 103 over several prior art patents, including U.S. Patent No. 6,329,354 B1 ("the McOsker patent"), which stems from a U.S. patent application filed February 26, 1991; U.S. Patent No. 5,622,721 ("the Dansereau patent"), which stems from a U.S. patent application filed November 22, 1991; and U.S. Patent No. 5,391,743 ("the Ebetino patent"), which stems from a U.S. patent application filed May 29, 1992.

The McOsker patent disclosed methods of treating osteoporosis by administering a bisphosphonate in conjunction with estrogen.  (McOsker patent at col. 2, line 60-67). Alendronate was one of the bisphosphonates specifically disclosed for such a use.  (*Id.* at col. 10, line 9).  A proposed formulation of the bisphosphonates included tablets containing lactose, microcrystalline cellulose, sodium starch glycolate and magnesium stearate.  (*Id.* at col. 16, line 61-col. 17, line 10).

The Dansereau patent disclosed the use of a related composition to alendronate, namely risedronate, in the treatment of osteoporosis.  The Dansereau patent specifically sought to ameliorate gastric problems introduced by risedronate by applying an enteric coating to tablets. (Dansereau patent at col. 2, lines 39-44).  One specific tablet formulation used 30 mg of risedronate in conjunction with lactose, microcrystalline cellulose, crospovidone and magnesium stearate.  (*Id.* at col. 14, lines 52-58).  Along with povidone, the specification identified sodium carboxymethylcellulose as a "preferred" viscosity agent.  (*Id.* at col. 8, lines 57-58).  Further, such tablets were made using direct compression techniques.  (*Id.* at col. 14, line 63-col. 15, line 5).

The Ebetino patent discloses a variety of bisphosphonates that modified the structure of existing bisphosphonates, such as those having the structure of alendronate, by adding cyclic substituents to the nitrogen functional group, for example.  (Ebetino patent at col. 5, line 38-col. 6, line 51).  Such bisphosphonates were identified as having the ability to treat osteoporosis.  (*Id.* at col. 5, lines 23-26).  Tablets containing these bisphosphonates used as excipients spray-dried lactose, starch and magnesium stearate, and were made using direct compression techniques.  (*Id.* at col. 43, lines 19-44).  Further, the Ebetino patent noted that the amino groups in the disclosed bisphosphonates were susceptible to hydrolysis, a factor that should guide excipient selection.  (*Id.* at col. 19, lines 28-34).  Excipients that were identified as

"preferred" included lactose, microcrystalline cellulose, magnesium stearate and croscarmelose sodium. (*Id.* at col. 21, lines 44-47; 50-51; and 57-59).

The McOsker, Dansereau and Ebetino patents constitute prior art under 35 U.S.C. § 102(e) and § 103 because each stems from applications filed prior to the filing date of the '941 patent. Furthermore, each discloses the use of bisphosphonates for the treatment of osteoporosis. As such, they are in the same field of endeavor as the claimed invention and are thus appropriate prior art. *See, e.g., In re Merck & Co.*, 800 F.2d at 1098-99 (noting that amitriptyline and imipramine were both tricyclic antidepressant drugs and thus in the same field of endeavor for obviousness analysis).

  a.  Claim 1.

Claim 1 requires the following elements:

- A pharmaceutical composition;

- comprising by weight about 0.5 to 40% of an active ingredient;

- the active ingredient is selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid [alendronate]; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethyl-amino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxy-propylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxy-propylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentyl-amino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl] ethylidene-1,1-bisphosphonic acid [risedronate]; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine, and their pharmaceutically acceptable salts;

- about 60% to 99.5% by weight of excipients, consisting essentially of:

- anhydrous lactose;

- microcrystalline cellulose;

- croscarmellose sodium; and

- magnesium stearate.

Each of these elements is found expressly or inherently in the McOsker, Dansereau and/or Ebetino patents.

-51-

### i.    A pharmaceutical composition.

The McOsker, Dansereau, and Ebetino patents each expressly disclose a "pharmaceutical composition." (McOsker patent at col. 11, lines 65-67 (explaining that certain dosage levels should be implemented "to standardize the amount of phosphonates to be used in the pharmaceutical compositions and methods of the present invention"); Dansereau patent at col. 5, lines 33-39 (reciting "a pharmaceutical composition comprised of a safe and effective amount of a risedronate active ingredient and pharmaceutically-acceptable excipients"); and Ebetino patent at col. 18, lines 18-34 (stating that "[t]he term 'pharmaceutical composition' as used herein means a combination comprised of a safe and effective amount of the ... active ingredient, or mixtures thereof, and pharmaceutically-acceptable excipients"). All three patents anticipate this element.

### ii.    Comprising by weight about 0.5 to 40% of an active ingredient.

The McOsker patent discloses that the pharmaceutically acceptable carriers "in total, may comprise from about 0.1% to about 99.9% by weight of the pharmaceutical compositions of the present invention, preferably from about 5% to about 80%, and most preferably from about 10% to about 50%." (McOsker patent at col. 15, lines 4-8). By extension, then, the active ingredient comprises from about 0.1 to 99.9% by weight of the disclosed compositions, preferably from about 20% to about 95%. Both ranges encompass the 0.5% to 40% range called for by claim 1. When an ingredient range disclosed in the prior art overlaps with a claimed range in a patent, as it does here, that element is anticipated. *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1345 (Fed. Cir. 1999).

Similarly, the Dansereau and Ebetino patents each disclose the weight percent of an active ingredient within the claimed range. Specifically, Dansereau's example for risedronate sodium compressed tablets utilizes 30 mg of risedronate constituting 12% by weight percent of the 250 mg tablet. (Dansereau patent at col. 14, lines 50-62). Ebetino calls for a pharmaceutical composition containing from about 20% to about 80% by weight of active ingredient. (Ebetino patent at col. 23, lines 10-12). These amounts overlap with the claimed range. *See Chester v. Miller*, 906 F.2d 1574, 1578 (Fed. Cir. 1990) (holding that claim reciting a zeolite having "a silica to alumina mole ratio of at least 12" was anticipated by a prior art reference disclosing zeolites having a silica/alumina mole ratio with ranges up to about 60).

All three patents anticipate this element.

### iii.    Active ingredient selected from group consisting of [various bisphosphonic acids].

The McOsker patent discloses 4-amino-1-hydroxybutane-1,1-bisphosphonic acid (otherwise known as alendronic acid), including its pharmaceutically-acceptable salts and esters. (McOsker patent at col. 10, line 8, 20; *see also* col. 8, line 25 (incorporating by reference U.S. Patent No. 4,621,077 which discloses alendronate sodium trihydrate). The Dansereau patent discloses risedronate, including a pharmaceutically acceptable sodium salt. (Dansereau patent at col. 14, line 46). The Ebetino patent provides a general formula for phosphonates wherein the

-52-

suggested substituents would create a structure having the formula of risedronate. (Ebetino patent at col. 5, line 38-col. 6, line 51). The Ebetino patent further teaches that preferred salts for the compounds "include the alkali-metal salts (such as sodium and potassium)." (*Id.* at col. 8, lines 66-68). All three patents anticipate this element.

### iv.     About 60% to 99.5% by weight of excipients.

The McOsker patent teaches a weight range of excipients comprising from about 0.1% to 99.9% by weight of the pharmaceutical compositions and preferably from about 5% to 80% by weight. (McOsker patent at col. 15, lines 4-8). The Dansereau patent incorporates an example containing 88% by weight of excipients. (Dansereau patent at col. 14, line 55-59). The Ebetino patent teaches pharmaceutical compositions containing 0.1 to 99% by weight of the compounds claimed (including various bisphosphonates) and by extension 0.1 to 99% by weight of excipients). (Ebetino patent at col. 23, lines 7-14).

Because the excipient weight percent in each of these patents falls within the range claimed or overlaps the range claimed, the "about 60% to 99.5% by weight of excipients" limitation is disclosed and therefore anticipated by any one of these patents. *See Chester*, 906 F.2d at 1578.

### v.     Anhydrous lactose.

The McOsker patent states that "[s]ome examples of the substances which can serve as pharmaceutical carriers [within the invention] are: sugars, such as lactose ...." (McOsker patent at col. 14, lines 43-44). Example 3 of the patent discloses a tablet using lactose as an excipient. (*See id.* at col. 17, lines 5-10). As such, the McOsker patent does not limit the type of lactose to be employed. Moreover, the absence of a solvent component within the McOsker formulation implies that the tablet is made using direct compression and/or dry granulation techniques.

Similarly, the Dansereau patent discloses a formulation containing lactose. (Dansereau patent at col. 14, line 56). Furthermore, the patent calls for making tablets using a direct compression method. (*Id.* at col. 14, line 63-col. 15, line 5).

The Ebetino patent further describes lactose as a desirable, and preferred, excipient. (Ebetino patent at col. 21, lines 44-45). Moreover, example 20 uses spray-dried lactose in conjunction with a direct compression process. (*Id.* at col. 43, line 27, 32-44).

Furthermore, prior art U.S. Patent No. 5,047,246 ("the '246 patent") states that there "are currently several available binders or excipients which can be used as direct compression vehicles [including] spray-dried lactose; anhydrous lactose; microcrystalline cellulose; dicalcium phosphate dihydrate, unmilled; spray-congealed mannitol; ungelatinized starch (e.g., corn starch), and partially or fully pregelatinized starch." ('246 patent at col. 2, lines 5-11).

Accordingly, the "anhydrous lactose" limitation is expressly or inherently disclosed in the McOsker, Dansereau or Ebetino patents. In the alternative, it is obvious in view of the '246 patent, which explicitly describes anhydrous lactose as a direct compression vehicle.

### vi.     Microcrystalline cellulose.

The McOsker and Dansereau patents both teach the use of microcrystalline cellulose. (McOsker patent at col. 17, lines 5-10; Dansereau patent at col. 14, line 57). The Ebetino patent also identifies microcrystalline cellulose as a desirable excipient. (Ebetino patent at col. 21, lines 47 and 59). All three patents thus anticipate this element.

### vii.     Croscarmellose sodium.

The McOsker patent expressly teaches incorporating "cellulose and its derivatives, such as sodium carboxymethylcellulose." (McOsker patent at col. 14, lines 46-47). The Dansereau patent specification also discloses sodium carboxymethylcellulose as a preferred viscosity agent. (Dansereau patent at col. 14, lines 60-62). Croscarmellose sodium is a cross-linked polymer of carboxymethylcellulose sodium. HANDBOOK OF PHARMACEUTICAL EXCIPIENTS 181 (Raymond C. Rowe et al. eds., 4th ed. 2003). Both patents either expressly anticipate the croscarmellose sodium limitation or render the term obvious in light of the structural similarities between the carboxymethylcellulose sodium and its cross-linked polymer. *See Dillon*, 919 F.2d at 692 (holding claim obvious where "structural similarity between claimed and prior art subject matter [existed and] ... prior art g[ave] reason or motivation to make the claimed compositions.").

The Ebetino patent expressly identifies sodium croscarmelose as a preferred disintegrant. (Ebetino patent at col. 21, lines 57-61).

The three patents either anticipate and/or render this element obvious.

### viii.     Magnesium stearate.

Each of the McOsker, Dansereau and Ebetino patents disclose specific tablet examples utilizing magnesium stearate. (McOsker patent at col. 17, lines 5-10; Dansereau patent at col. 14, line 59; Ebetino patent at col. 43, line 29). This element thus is anticipated by each of the McOsker, Dansereau and Ebetino patents.

*          *          *

In sum, each and every element of claim 1 is found in either the McOsker patent, the Dansereau patent, or the Ebetino patent. Alternatively, the pharmaceutical composition of claim 1 is obvious in view of those patents.

For at least these reasons, claim 1 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

b.    **Claim 2.**

Claim 2 requires the following primary elements:

- A pharmaceutical composition;

- comprising by weight about 0.5 to 40% of an active ingredient;

- the active ingredient is selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid [alendronate]; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethyl-amino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxy-propylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxy-propylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentyl-amino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl] ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine, and their pharmaceutically acceptable salts;

- about 10 to 80% by weight anhydrous lactose;

- about 5 to 50% by weight microcrystalline cellulose;

- about 0.5 to 10% by weight croscarmellose sodium; and

- about 0.1 to 5% by weight magnesium stearate.

Claim 2 is essentially identical to claim 1, except for the additional weight ranges for the claimed ingredients. The discussion above for claim 1 applies equally here to claim 2 and is incorporated by reference herein. The additional weight ranges do not impart novelty to the claimed formulations.

### i.    About 10% to 80% by weight anhydrous lactose.

Example 3 of the McOsker patent discloses a tablet formulation containing 80 mg of lactose, equating into 31% by weight of the 259.5 mg tablet. (McOsker patent at col. 17, lines 5-10). The Dansereau patent example contains lactose constituting 61% of the 250 mg formulation. (Dansereau patent at col. 14, line 56). The Ebetino example contains lactose constituting 61% of the excipient mix and 19.5% of the overall formulation. (Ebetino patent at col. 43, line 27). These weight percents fall within, and therefore anticipate, the range recited in claim 1. *See Chester*, 906 F.2d at 1578 (patentee's claim of a silica/alumina ratio of "at least 12" fell within the range disclosed in the prior art – "a ratio up to about 60" – and was anticipated).

### ii.    About 5 to 50% by weight microcrystalline cellulose.

The same McOsker patent example utilizes 50 mg or 19% by weight of microcrystalline cellulose. (McOsker patent at col. 17, lines 5-10). The Dansereau patent's

-55-

specific tablet formulation example contains approximately 24% microcrystalline cellulose. (Dansereau patent at col. 14, line 49-58). The Ebetino patent's capsule example utilizes microcrystalline cellulose constituting 12% of the overall formulation. (Ebetino patent at col. 42, lines 60-67). Furthermore, the Ebetino patent specification teaches that for the specific tablet and capsule formulations, it "is well within the capabilities of one skilled in the art to vary the non-limiting examples described herein to achieve a broad range of pharmaceutical compositions." (*Id.* at col. 23, lines 39-42). All three patents anticipate this element as well.

### iii.    About 0.5 to 10% by weight croscarmellose sodium.

The Ebetino patent specification identifies sodium croscarmellose as a desirable, and preferred, excipient, which can be used as a preferred disintegrant and further teaches that the "pharmaceutical compositions of the present invention include from 4-15% disintegrants." (Ebetino patent at col. 21, lines 57-61).

The McOsker patent teaches the use of "sodium carboxymethylcellulose," which forms the backbone of croscarmellose sodium, at levels of 3%, a level within the claimed range. (McOsker patent at col. 14, lines 46-47).

Both patents either anticipate and/or render this element obvious.

### iv.    About 0.1 to 5% by weight magnesium stearate.

The McOsker, Dansereau and Ebetino patent examples incorporate "magnesium stearate" at levels falling within the claimed range. (McOsker patent at col. 17, lines 5-10) (making up approximately 0.6% of the Example 3 formulation); Dansereau patent at col. 14, line 59 (making up 0.43% of the total formulation); Ebetino patent at col. 43, line 29; col. 21, lines 50-53 (utilizing magnesium stearate in example and teaching that preferred lubricants, including magnesium stearate should be incorporated in the 0.5-2% weight range). All three patents anticipate this element.

*    *    *

In sum, each and every element of claim 2 is found in either the McOsker patent, the Dansereau patent, or the Ebetino patent. Alternatively, the pharmaceutical composition of claim 2 is obvious in view of those patents.

For at least these reasons, claim 2 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

### c.    Claim 3.

Claim 3 is identical to claim 2, except for additional weight limitations on the proportions of active ingredient and excipients, as follows:

- about 0.5 to 25% by weight of the active ingredient;

- about 30 to 70% by weight of anhydrous lactose;

-56-

- about 30 to 50% by weight microcrystalline cellulose;

- about 0.5 to 5% by weight croscarmellose sodium; and

- about 0.1 to 2% by weight magnesium stearate.

The McOsker, Dansereau and/or Ebetino patents each expressly anticipate and/or render obvious these additional limitations.

### i.    About 0.5 to 25% by weight active ingredient.

The McOsker patent discloses an active ingredient falling within this range. (McOsker patent at col. 15, lines 4-8). Furthermore, the Dansereau patent example for risedronate sodium compressed tablets contains active ingredient making up 12% of the formulation (Dansereau patent at col. 14, lines 50-62), whereas Ebetino calls for 20 to 80% of the active ingredient. (Ebetino patent at col. 23, lines 10-11). All three patents anticipate this element.

### ii.    About 30 to 70% by weight anhydrous lactose.

The McOsker patent details the pharmaceutically acceptable carriers that can be used in the final dosage forms, including lactose. The excipient mix will preferably constitute between 5-80% of the tablet formulation. The McOsker Example 3 uses 139 mg of excipients, of which approximately 57% is lactose. (*Id.* at col. 17, lines 5-10). The Dansereau patent's formulation example contains 61% lactose by weight of the 250 mg tablet. (Dansereau patent at col. 14, line 56). Both patents anticipate, and/or render obvious, this element.

### iii.    About 30 to 50% by weight microcrystalline cellulose.

McOsker's Example 3 tablet example in the patent uses 50 mg of microcrystalline cellulose. Substituting, alendronate as the active ingredient (as is required in claim 3) rather than alendronic acid would give a formulation containing 25-30% by weight of microcrystalline cellulose. (McOsker patent at col. 17, lines 5-10).

The Dansereau tablet formulation example contains approximately 24% microcrystalline cellulose in the context of the risedronate formulation. (Dansereau patent at col. 14, line 57). However, because "the excipients may also be varied, as long as they do not affect the activity" of the active ingredient, (*Id.* at col. 8, lines 15-18), this claim element is anticipated by Dansereau or alternatively obvious.

Both patents anticipate, and/or render obvious, this element.

### iv.    About 0.5 to 5% by weight croscarmellose sodium.

The McOsker patent teaches the use of "sodium carboxymethylcellulose," which forms the backbone of croscarmellose sodium, at levels of 3%. The Ebetino patent specification identifies sodium croscarmellose as a desirable, and preferred, excipient, which can be used as a preferred disintegrant and further teaches that the "pharmaceutical compositions of the present

invention include from 4-15% disintegrants." (Ebetino patent at col. 21, lines 57-61). Both patents anticipate, and/or render obvious, this element.

<strong>v.    About 0.1 to 2% by weight magnesium stearate.</strong>

The McOsker patent example discloses a tablet composition containing magnesium stearate making up approximately 0.6% of the tablet weight. (McOsker patent at col. 17, lines 5-10). The Dansereau patent's example uses magnesium stearate as well and contains 0.43% of the formulation. (Dansereau patent at col. 14, line 59). The Ebetino patent's specific tablet example uses magnesium stearate and the specification teaches the use of 0.5-2% of lubricant. (Ebetino patent at col. 43, line 29; col. 21, lines 50-53). All three patents anticipate this element.

For at least these reasons and those discussed above for claim 2, which are incorporated by reference, claim 3 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

<strong>d.    Claim 4.</strong>

Claim 4 is identical to claim 2, except the active ingredient must be "4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid," otherwise known as alendronic acid.

The McOsker patent discloses this active ingredient. (McOsker patent at col. 10, line 8). The Dansereau and Ebetino patents disclose related bisphosphonates.

For at least these reasons and those discussed above for claims 2-3, which are incorporated by reference, claim 4 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

<strong>e.    Claim 5.</strong>

Claim 5 is identical to claim 2, except the active ingredient must be "4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt trihydrate," or alendronate sodium trihydrate. The McOsker patent identifies 4-amino-1-hydroxybutane-1,1-bisphosphonic acid as a preferred phosphonate and indicates that it is desirable to use its pharmaceutically acceptable salts and esters. (McOsker patent at col. 10, line 8, 20). The McOsker patent also incorporates other patents, including U.S. Patent No. 4,621,077, that disclose the monosodium trihydrate salt. *See Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1370 (Fed. Cir. 2003).

Although the Dansereau and Ebetino patents do not expressly disclose alendronate, a person of ordinary skill in the art would be motivated to use their disclosed formulations for other bisphosphonates, such as the alendronate disclosed in other U.S. patents, including U.S. Patent No. 4,621,077.

For at least these reasons and those discussed above for claims 2-4, which are incorporated by reference, claim 5 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

-58-

### f.    Claim 6.

Claim 6 is identical to claim 5, except for additional weight limitations on the proportions of active ingredient and excipients, as follows:

- about 1 to 25% by weight the active ingredient;

- about 40 to 60% by weight anhydrous lactose;

- about 35 to 45% by weight microcrystalline cellulose;

- about 0.5 to 2% by weight croscarmellose sodium; and

- about 0.1 to 1% by weight magnesium stearate.

The McOsker, Dansereau and/or Ebetino patents each expressly anticipate and/or render obvious these additional limitations.

#### i.    About 1 to 25% by weight of an active ingredient.

The McOsker patent discloses an active ingredient falling within this range. (McOsker patent at col. 15, lines 4-8). Furthermore, the Dansereau patent example for risedronate sodium compressed tablets contains active ingredient making up 12% of the formulation (Dansereau patent at col. 14, lines 50-62), whereas Ebetino calls for 20 to 80% of the active ingredient. (Ebetino patent at col. 23, lines 10-11). All three patents anticipate this element.

#### ii.    About 40 to 60% by weight anhydrous lactose.

The McOsker patent details the pharmaceutically acceptable carriers that can be used in the final dosage forms, including lactose. The excipient mix will preferably constitute between 5-80% of the tablet formulation. The McOsker Example 3 uses 139 mg of excipients, of which approximately 57% is lactose. (*Id.* at col. 17, lines 5-10). Furthermore, substituting 40 mg of alendronate for the active ingredient (as is required by claim 6) gives a formulation that would possess approximately 44% lactose. The Dansereau patent's formulation example contains 61% lactose by weight of the 250 mg tablet. (Dansereau patent at col. 14, line 56). Because this claim limitation calls for "about 40-60% lactose", in accordance with the Federal Circuit's interpretation of the term "about" in *Merck*, 61% clearly falls within this range. Moreover, if a 40 mg alendronate sample is substituted into the specific tablet formulation the lactose levels will be within the 40-60% range. Both patents anticipate, and/or render obvious, this element.

#### iii.    About 35 to 45% by weight microcrystalline cellulose.

The McOsker patent's Example 3 tablet uses 50 mg of microcrystalline cellulose. Substituting, alendronate as the active ingredient rather than alendronic acid would give a formulation containing 25-30% by weight of microcrystalline cellulose. (McOsker patent at col.

17, lines 5-10). In light of the Federal Circuit construction of the term "about" with respect to related alendronate patents, the range in McOsker either anticipates the range claimed or alternatively renders that range obvious.

The Dansereau tablet formulation example contains approximately 24% microcrystalline cellulose in the context of the risedronate formulation. (Dansereau patent at col. 14, line 57). However because "the excipients may also be varied, as long as they do not affect the activity" of the active ingredient, (*Id.* at col. 8, lines 15-18), this claim element is anticipated by Dansereau or alternatively obvious.

### iv.  About 0.5 to 2% by weight croscarmellose sodium.

The McOsker patent teaches the use of "sodium carboxymethylcellulose," which forms the backbone of croscarmellose sodium, at levels of 3%, which is approximately 2%. The Ebetino patent specification identifies sodium croscarmellose as a desirable, and preferred, excipient, which can be used as a preferred disintegrant and further teaches that the "pharmaceutical compositions of the present invention include from 4-15% disintegrants." (Ebetino patent at col. 21, lines 57-61) Ebetino also observes that small variations in these ranges would be routine for a person of ordinary skill in the art. Both patents anticipate, and/or render obvious, this element.

### v.  About 0.1 to 1% by weight magnesium stearate.

The McOsker patent example discloses a tablet composition containing magnesium stearate making up approximately 0.6% of the tablet weight. (McOsker patent at col. 17, lines 5-10). The Dansereau patent's example uses magnesium stearate as well and contains 0.43% of the formulation. (Dansereau patent at col. 14, line 59). The Ebetino patent's specific tablet example uses magnesium stearate and the specification teaches the use of 0.5-2% of lubricant. (Ebetino patent at col. 43, line 29; col. 21, lines 50-53). All three patents anticipate this element.

\*      \*      \*

In sum, each and every element of claim 6 is either expressly found in, or rendered obvious by, the McOsker, Dansereau, and Ebetino patents.

For at least these reasons and those discussed above for claims 2-5, which are incorporated by reference, claim 6 is invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

### g.  Claims 7 and 8.

Claim 7 is identical to claim 5, except the dosage form must be a tablet. Claim 8 is identical to claim 2, except it also requires the dosage form to be a tablet. The McOsker patent teaches the preferred "unit dosage forms include tablets." (McOsker patent at col. 15, lines 9-13; col. 16, line 67–col. 17, line 15). The Dansereau and Ebetino likewise disclose tablet formulations. All three patents anticipate this element.

For at least these reasons and those discussed above for claims 2-5, which are incorporated by reference, claims 7-8 are invalid for anticipation under 35 U.S.C. § 102(e) or, in the alternative, obviousness under 35 U.S.C. § 103.

### 2. Noninfringement of Claims 1-8.

The manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 1-8 of the '941 patent, either literally or under the doctrine of equivalents.

#### a. No Literal Infringement.

Claims 1 and 2 require a pharmaceutical composition containing "anhydrous lactose." Claims 3-8 depend from claim 2, either directly or indirectly, and therefore incorporate all of the limitations of claim 2. *See* 35 U.S.C. § 112, ¶ 4.

Thus, all claims require the use of "anhydrous lactose," which is a specific form of lactose that is free from bound water.

The prosecution history further confirms this construction of the claims. As originally filed, the independent claims of the '941 patent incorporated language allowing the use of either anhydrous lactose or hydrous fast flow lactose. ('941 patent PH, Original Application at 14, 17-19). During prosecution, however, the examiner rejected all claims as obvious over references generically disclosing the use of anhydrous and hydrous fast flow lactose. (*Id.*, 8/11/1993 Office Action at 3). In response, the patentees argued that these references did not specifically teach the use of anhydrous lactose. (*Id.*, 11/10/1993 Response at 2).

In sum, properly construed in view of the intrinsic evidence, the term "anhydrous lactose," as recited in claims 1-8, must be limited to crystalline anhydrous forms of lactose alone.

Here, Cobalt's ANDA Product does not contain or employ anhydrous lactose. For at least these reasons, Cobalt's ANDA Product would not literally infringe claims 1-8.

#### b. No Infringement Under the Doctrine of Equivalents.

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 1-8 of the '941 patent under the doctrine of equivalents.

The anhydrous lactose limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain this particular form of lactose, since such a scope of equivalents would impermissibly vitiate this limitation and also ensnare prior art formulations. Merck is also estopped from asserting a range of equivalents that would include compositions that do not contain anhydrous lactose by virtue of Merck's representations and arguments to the PTO in which it surrendered this subject matter in order to obtain allowance of the claims.

For at least these reasons, Cobalt's ANDA Product would not infringe claims 1-8 under the doctrine of equivalents.

**G.    The '590 patent.**

The '590 patent issued on October 28, 1997, and was assigned, on its face, to Merck.  The patent contains seventeen claims, which read as follows:

      1.    A process for the preparation of a tablet containing an active ingredient selected from: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bis-phosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salts thereof;

which process comprises:

forming a mixture by mixing the active ingredient with: a diluent, selected from: anhydrous lactose and hydrous fast flow lactose, a dry binder, a disintegrant, and optionally one or more additional ingredients selected from the group consisting of: compression aids, flavors, flavor enhancers, sweeteners and preservatives;

lubricating the mixture with a lubricant; and

compressing the resultant lubricated mixture into a desired tablet form.

      2.    The process of claim 1 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid.

      3.    The process of claim 1 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt trihydrate.

      4.    The process of claim 1 wherein the dry binder is microcrystalline cellulose.

      5.    The process of claim 1 wherein the disintegrant is selected from the group consisting of modified starch, modified cellulose polymer, and croscarmellose sodium, and a combination thereof.

-62-

6.    The process of claim 1 wherein the disintegrant is croscarmallose sodium.

7.    The process of claim 1 wherein the lubricant is magnesium stearate.

8.    A solid dosage form containing an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salt thereof; wherein the dosage form is prepared by the process of claim 1.

9.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bis-phosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salt thereof; and from about 60 to 99.5% by weight of excipients consisting essentially of: hydrous fast flow lactose; microcrystalline cellulose; croscarmallose sodium; and magnesium stearate.

10.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-(3-pyridyl)ethylidene-1,1-bisphosphonic acid; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or a pharmaceutically acceptable salt thereof; about 10 to 80% by

weight of hydrous fast flow lactose; about 5 to 50% by weight of microcrystalline cellulose; about 0.5 to 10% by weight of croscarmallose sodium; and about 0.1 to 5% by weight of magnesium stearate.

11.    The pharmaceutical composition of claim 10 comprising about 0.5 to 25% by weight of the active ingredient, about 30% to 70% by weight of hydrous fast flow lactose; about 30 to 50% by weight of microcrystalline cellulose; about 0.5 to 5% by weight of croscarmallose sodium; and about 0.1 to 2% by weight of magnesium stearate.

12.    The pharmaceutical composition of claim 10 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid.

13.    The pharmaceutical composition of claim 10 wherein the active ingredient is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt trihydrate.

14.    A tablet prepared from the pharmaceutical composition of claim 13.

15.    A tablet prepared from the pharmaceutical composition of claim 10.

16.    A process for the preparation of a tablet containing as active ingredient a basic nitrogen containing bisphosphonate: which process comprises:

forming a mixture by mixing the active ingredient with: a diluent, selected from: anhydrous lactose or hydrous fast flow lactose, a dry binder, a disintegrant, and optionally one or more additional ingredients selected from the group consisting of: compression aids, flavors, flavor enhancers, sweeteners and preservatives; lubricating the mixture with a lubricant; and compressing the resultant lubricated mixture into a desired tablet form.

17.    A solid dosage form containing as active ingredient a basic nitrogen containing bisphosphonate wherein the dosage form is prepared by the process of claim 1.

('590 patent at cols. 7-10).

1.    **Invalidity of Claims 1-17.**

Claims 1-17 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, for obviousness under 35 U.S.C. § 103 over several prior art patents, including the McOsker, Dansereau and Ebetino patents discussed above for the related '941 patent.

a.    **Claim 1.**

Claim 1 includes the following elements:

- Preparation of a tablet;

- containing a certain active ingredient, selected from 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bis-phosphonic acid; 4-(N,N-dimethyl-amino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethyl-amino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine; or their pharmaceutically acceptable salts;

- preparing the tablet by mixing the active ingredient with a lactose-based diluent;

- adding a dry binder to the mix;

- adding a disintegrant to the mix;

- optionally adding flavorings, compression aids, sweeteners, preservatives;

- adding a lubricant to the mix; and

- compressing the lubricated mixture into a desired tablet form.

('590 patent at col. 7, line 56–col. 8, line 19).

As an initial matter, claim 1 is a process claim and therefore is not cognizable under 35 U.S.C. § 271(e)(2)(A), which provides jurisdiction only for the adjudication of product and method of use claims. To the extent Merck attempts to assert this claim against Cobalt under the Declaratory Judgment Act, all of the elements of claim 1 are either anticipated and/or rendered obvious by the McOsker, Dansereau, and Ebetino patents.

i.    **Preparation of a tablet.**

For the same reasons discussed above for claims 7 and 8 of the '941 patent, which are incorporated by reference herein, each of the McOsker, Dansereau and Ebetino patents discloses a tablet formulation example. Thus, this element is expressly anticipated by each of these patents.

ii.    **Active ingredient.**

For the same reasons discussed above for claim 1 of the '941 patent, which are incorporated by reference herein, each of the McOsker, Dansereau and Ebetino patents discloses this element. Thus, this element is expressly anticipated by each of the patents.

iii.    **Mix active and lactose.**

The McOsker, Dansereau, and Ebetino patents all disclose tablet formulations incorporating lactose. The McOsker patent includes a tablet formulation made by mixing the active with lactose. (*See* McOsker patent at col. 17, lines 1-15). The Dansereau patent expressly states that for its specific tablet formulation using lactose, the milled blend of active and microcrystalline cellulose is "returned to the twin shell blender along with the lactose … and mixed until uniform." (Dansereau patent at col. 15, lines 1-3). The Ebetino patent's specific tablet example prepares the tablets first by milling the active ingredient, and "then blended in a twinblade mixer with the spray-dried lactose for approximately twenty (20) minutes." (Ebetino patent at col. 43, lines 31-38). All three patents anticipate this element.

iv.    **Add dry binder.**

The '590 patent indicates that the dry binder includes ingredients such as microcrystalline cellulose. ('590 patent at col. 2, lines 10-13). The McOsker patent's specific tablet formulation example incorporates microcrystalline cellulose and provides an ingredient list that excludes the use of any solvents, informing one of ordinary skill in the art that the tablets were prepared using dry granulation or direct compression, rather than wet granulation techniques. (McOsker patent at col. 17, lines 5-10). Dansereau expressly states that the tablets are prepared "by mixing the risedronate active ingredient with the microcrystalline cellulose in a twin shell blender" under dry conditions. (Dansereau patent at col. 14, line 65– col. 15, line 1). Ebetino also adds its binder (starch) to the tablet formulation after the active and lactose have been dry-mixed, for further dry mixing for an additional 15 minutes. (Ebetino patent at col. 43, lines 30-44). All three patents anticipate this element.

v.    **Adding a Disintegrant.**

The '590 patent identifies several disintegrants, including modified starches, modified cellulose polymers, and croscarmellose sodium (also known as cross-linked sodium carboxymethylcellulose). The Ebetino patent prepares its tablets using dry-mix conditions and mentions that disintegrants may be used in the proposed formulations, including croscarmellose sodium. (Ebetino patent at col. 21, lines 57-61). The McOsker patent discloses that sodium carboxymethylcellulose is a pharmaceutical carrier that can be used in the disclosed

-66-

pharmaceutical formulations. (McOsker patent at col. 14, lines 43-58). The Dansereau patent discloses a class of excipients referred to as "viscosity agents," which including povidone and sodium carboxymethylcellulose. (Dansereau patent at col. 8, lines 57-62). The Dansereau tablet example uses povidone, and combines it into the tablet mixture along with the lactose where the mixture is dry-mixed until uniform. (*Id.* at col. 15, lines 1-3). All three patents anticipate this element.

### vi.    Adding a Lubricant.

The '590 patent identifies magnesium stearate as a desirable lubricant to use in the disclosed tablet formulations. ('590 patent at col. 2, line 19). The McOsker, Dansereau and Ebetino patents each use magnesium stearate in their specific tablet examples. (McOsker patent at col. 17, line 10; Dansereau patent at col. 14, line 59; Ebetino patent at col. 43, line 30). All three patents anticipate this element.

### vii.    Compressing the lubricated mixture into a desired tablet form.

Claim 1 describes a direct compression process. Each of the tablets disclosed in the specific examples in the McOsker, Dansereau and Ebetino patents are made without the use of a solvent, thereby disclosing a dry-mix system or direct compression process. Further, the Dansereau patent explains that after the magnesium stearate is added to the active-excipient mixture, the composition "is mixed until adequate lubrication is achieved. Tablets are then compressed on a rotary press." (Dansereau patent at col. 15, lines 3-6). Ebetino too takes its dry mix and the "blend is compressed into tablets on a standard tablet press." (Ebetino patent at col. 43, lines 40-41). All three patents anticipate this element.

*        *        *

In sum, the McOsker patent, the Dansereau patent, or the Ebetino patent disclose each and every element of claim 1. Alternatively, the McOsker, Dansereau and Ebetino patents, either alone or in combination with each other, render each element of claim 1 obvious.

For at least these reasons, claim 1 is invalid for anticipation under 35 U.S.C. § 102(e)(2) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### b.    Claims 2 and 3.

Claim 2 is identical to claim 1, except the active ingredient must be alendronate sodium. Claim 3 is identical to claim 1, except the active ingredient must be alendronate monosodium trihydrate. For the same reasons discussed above for claims 4 and 5 of the '941 patent above, which are incorporated by reference herein, the McOsker patent specifically incorporates U.S. Patent No. 4,621,077, which discloses both alendronate sodium and alendronate monosodium trihydrate.

For at least these reasons and those discussed above for claim 1, as well as claims 4-5 of the '941 patent, which are incorporated by reference herein, claims 2-3 are invalid for

anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

      c.      **Claims 4-7.**

Claim 4 is identical to claim 1, except the binder must be microcrystalline cellulose. Claim 5 is identical to claim 1, except the disintegrant must be modified starch, modified cellulose polymer, or croscarmellose sodium. Claim 6 is identical to claim 1, except the disintegrant must be croscarmellose sodium. Claim 7 is identical to claim 1, except the lubricant must be magnesium stearate. As discussed above for claim 1, the McOsker, Dansereau and Ebetino patents either expressly anticipate and/or render obvious each of these elements.

For at least the reasons discussed above for claim 1, which are incorporated by reference herein, claims 4-7 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

      d.      **Claim 8.**

Claim 8 merely requires the product of process claim 1.

For the same reasons discussed above for claim 1, which are incorporated by reference herein, claim 8 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

      e.      **Claim 9.**

Claim 9 requires the following elements:

- A pharmaceutical composition;

- comprising by weight about 0.5 to 40% of an active ingredient;

- the active ingredient is selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid [alendronate]; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethyl-amino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxy-propylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxy-propylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentyl-amino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl] ethylidene-1,1-bisphosphonic acid [risdronate]; and 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine, and their pharmaceutically acceptable salts;

- about 60% to 99.5% by weight of excipients, consisting essentially of:

- hydrous fast flow lactose;

- microcrystalline cellulose;

- croscarmellose sodium; and

- magnesium stearate.

These elements are identical to those delineated in claim 1 of the '941 patent, except for the use of hydrous fast flow lactose. The McOsker, Dansereau and Ebetino patents either inherently or expressly disclose the use of any form of lactose and/or render this element obvious.

For at least these reasons and those discussed above for claim 1 of the '941 patent, which are incorporated by reference herein, claim 9 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### f.    Claim 10 and 11.

Claim 10 is identical to claim 2 of the '941 patent, except for the use of hydrous fast flow lactose. Similarly, claim 11 is identical to claim 3 of the '941 patent, except for the use of hydrous fast flow lactose. As discussed above for claim 1, however, the McOsker, Dansereau and Ebetino patents either inherently or expressly disclose the use of any form of lactose and/or render this element obvious.

For the same reasons discussed above for claims 1-3 of the '941 patent and claim 1 of the '590 patent, which are incorporated by reference herein, claims 10-11 are invalid for anticipation under 35 U.S.C. §102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### g.    Claims 12 and 13.

Claim 12 is identical to claim 10, except that it requires alendronate. Claim 13 is identical to claim 10, except that it requires alendronate monosodium trihydrate.

For the same reasons discussed above for claims 2-3 and 10-11, which are incorporated by reference herein, claims 12-13 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### h.    Claims 14 and 15.

Claims 14 and 15 are identical to claims 13 and 10, respectively, except the dosage form must be a tablet.

For the same reasons discussed above for claims 1-13, which are incorporated by reference herein, claims 14-15 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

-69-

### i.    Claim 16.

Claim 16 is a process claim with elements identical to claim 1, except the active ingredient can be any basic nitrogen-containing bisphosphonate. However, the McOsker, Dansereau and Ebetino patents each disclose bisphosphonates containing nitrogen that can exist in a basic form.

For at least these reasons and those reasons discussed above for claim 1, which are incorporated by reference herein, claim 16 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### j.    Claim 17.

Claim 17 merely requires the product prepared by the process of claim 1, except the active ingredient must be a basic nitrogen-containing bisphosphonate.

For the same reasons discussed above for claims 1 and 16, which are incorporated by reference herein, claim 17 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### 2.    Noninfringement of Claims 1-17.

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 1-17 of the '590 patent, either literally or under the doctrine of equivalents.

### a.    No Literal Infringement.

Claims 1 and 16 require a particular dry-mix or direct compression process, namely:

> forming a mixture by mixing the active ingredient with: a diluent, selected from: anhydrous lactose and hydrous fast flow lactose, a dry binder, a disintegrant, and optionally one or more additional ingredients selected from the group consisting of: compression aids, flavors, flavor enhancers, sweeteners and preservatives; lubricating the mixture with a lubricant; and compressing the resultant lubricated mixture into a desired tablet form.

('590 patent at col. 8, lines 6-19; col. 10, 18-29). Claims 2-8 and 17 depend from claim 1 and therefore incorporate all of the limitations of that claim. *See* 35 U.S.C. § 112, ¶ 4.

The claims are clearly and unambiguously limited to a dry-mix or direct compression process, and necessarily exclude a wet granulation process.

The specification of the '590 patent confirms this construction. The '590 patent is entitled "*Dry Mix* Formulation For Bisphosphonic Acids," and the Abstract expressly states that the claimed formulations "are prepared by direct compression/dry mix tablet formulation." ('590

patent at cover). The specification clearly describes the invention as blending excipients prior to compression without granulation or hydration of any kind. ('590 patent at col. 1, lines 42-45). Moreover, the process described as a direct compression (dry mix) process recites the very process elements delineated in each of independent claims 1 and 16. (*Id.* at col. 1, line 58-col. 2, line 4). In these circumstances, the patentees acted as their own lexicographers, defining the process limitations narrowly to encompass only a dry mix or direct compression process. As noted above, lexicography does not require rigid formalism, but rather may be accomplished by implication in the specification. See *AstraZeneca*, 384 F.3d at 1339-40; *Bell Atl.*, 262 F.3d at 1268. Here, the patentees went well beyond mere implication by explicitly stating that their claim formulations are prepared by direct compression.

The patentees also disavowed the use of wet granulation procedures. In particular, the specification criticizes the use of wet granulation for causing instability and discoloration in products. ('590 patent at col. 1, lines 11-15, 26-31). This represents a clear disavowal of claim scope. Such a disavowal does not require rigid formalism, but rather any express or implied criticism of other products that lack the particular feature of the invention can suffice. See *AstraZeneca*, 384 F.3d at 1340; *see also SciMed*, 242 F.3d at 1345 ("[a] particular structure can be deemed outside the reach of the doctrine of equivalents because that structure is clearly excluded from the claims whether the exclusion is express or implied."). Additional parts of the specification, including reference to stability studies proclaiming the superiority of direct compression over wet granulation products in the avoidance of discoloration, ('590 patent at col. 6, lines 53-67), further reinforces the conclusion that the patentees limited the process elements to a direct compression process and disavowed wet granulation procedures.

In sum, the specification does not describe or enable anything but a dry-mix or direct compression process.

The prosecution history of the '590 patent and related '941 patent further confirms that the process elements are limited to a direct compression process and exclude a wet granulation process. The patentees repeatedly criticized wet granulation techniques, in particular wet granulation of bisphosphonates. In response to repeated objections based on prior art using wet granulation, the patentees argued that the prior art "teaches that bisphosphonates are formulated by wet granulation; *this is exactly the opposite of applicant's invention to a dry mix formulation and Isom[u]ra thus teaches away from Applicant's invention.*" ('941 patent PH, 11/10/1993 Response at 2 (emphasis added)). Accordingly, in order to obtain allowance of the claims, the patentees distinguished and disavowed "wet granulation" by arguing that it "is exactly the opposite of applicant's invention to a dry mix formulation."

In sum, properly construed in view of the intrinsic evidence, claims 1-8 and 16-17 all require a dry-mix or direct compression process, and exclude all wet granulation techniques.

Here, Cobalt does not utilize direct compression or "dry mix method." Rather Cobalt employs a wet granulation process that the '590 patent and prosecution history teach must be avoided and which the claims exclude.

For at least these reasons, Cobalt's ANDA product would not literally infringe claims 1-8, 16 and 17 of the '590 patent.

-71-

Claims 9-15 all require a pharmaceutical composition containing "hydrous fast flow lactose." The term "hydrous fast flow lactose" refers to a particular form of lactose "consist[ing] mainly of spherical aggregates of microcrystals.... [of] α-lactose monohydrate, [which] are held together by a higher concentration of [amorphous] glass than is present in regular spray-dried lactose." LIEBERMAN, H.A. AND LEON LACHMAN, PHARMACEUTICAL DOSAGE FORMS: TABLETS 155 (1st ed. 1980).

Neither the patent specification nor the prosecution history suggests that the "hydrous fast flow lactose" claim term be defined as anything other than what was known in the art at the time.

Here, Cobalt's ANDA Product does not contain "hydrous fast flow lactose." For at least these reasons, Cobalt's ANDA Product would not literally infringe claims 9-15 of the '590 patent.

**b.    No Infringement Under the Doctrine of Equivalents.**

The commercial manufacture, use, or sale of Cobalt's ANDA Product would not infringe claims 1-17 of the '590 patent under the doctrine of equivalents.

The differences between Cobalt's ANDA Product made by wet granulation without "hydrous fast flow lactose" and the recited claims that require a dry-mix or direct compression process and "hydrous fast flow lactose" are more than insubstantial. The dry-mix/direct compression process and "hydrous fast flow lactose" limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that are not made by such a process and do not contain this excipient, since such a scope of equivalents would impermissibly vitiate this limitation and also ensnare the prior art. Merck is also estopped from asserting any range of equivalents that would include Cobalt's ANDA Product or process by virtue of Merck's representations and arguments to the PTO in which it surrendered this subject matter in order to obtain allowance of the claims.

For at least these reasons, Cobalt's ANDA Product would not infringe any claim of the '590 patent under the doctrine of equivalents.

**H.    The '410 patent.**

The '410 patent issued on July 18, 2000, and was assigned, on its face, to Merck. The patent contains thirteen claims, which read as follows:

> 1.    A pharmaceutical composition comprising from about 0.5 to 40% by weight of a bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

2.     A pharmaceutical composition comprising from about 0.5 to 40% by weight of a nitrogen containing bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

3.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

4.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

5.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

6.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

7.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

8.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

9.     A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 4-(hydroxymethylene-

1,1-bisphosphonic acid) piperidine or a pharmaceutically acceptable salt thereof.

10.    A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid or a pharmaceutically acceptable salt thereof.

11.    A pharmaceutical composition according to claim 2 wherein said nitrogen containing bisphosphonic acid or pharmaceutically acceptable salt thereof is 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt trihydrate.

12.    A pharmaceutical composition comprising by weight about 0.5 to 40% by weight of an active ingredient selected from the group consisting of: 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; 4-(hydroxymethylene-1,1-bisphosphonic acid) piperidine; or a pharmaceutically acceptable salt thereof; and from about 60% to 99.5% by weight of excipients comprising: a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

13.    A composition according to any of claims 1-12 wherein said diluent is anhydrous lactose.

('410 patent at col. 6, line 54-col. 8, line 31).

1.    Invalidity of Claims 1-2 and 10-13.

Claims 1-2 and 10-13 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, for obviousness under 35 U.S.C. § 103 over several prior art patents, including the McOsker, Dansereau and Ebetino patents discussed above for the related '941 and '590 patents.

a.    Claim 1.

Claim 1 is identical to claim 9 of the '590 patent, except the active ingredient can be any bisphosphonate, the composition can contain "anhydrous lactose" or "hydrous fast-flow lactose" and the claim does not specify the binder, lubricant or disintegrant to be used. These

limitations only serve to broaden the limitations recited in claim 9 of the '590 patent and do not salvage the validity of the claim.

For the same reasons discussed above for claim 9 of the '590 patent, which are incorporated by reference herein, claim 1 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### b. Claim 2.

Claim 2 is identical to claim 1 above, except the active ingredient can be any basic nitrogen-containing bisphosphonate.

For the same reasons discussed above for claim 9 of the '590 patent and for claim 1 of the '410 patent, which are incorporated by reference herein, claim 2 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### c. Claims 10 and 11.

Claim 10 is identical to claim 2, except the bisphosphonic acid is limited to alendronate and its salts. Claim 11 is identical to claim 2, except the active ingredient must be alendronate monosodium trihydrate.

For the same reasons discussed above for claims 4-5 of the '590 patent and for claims 1-2 of the '410 patent, which are incorporated by reference herein, claims 10-11 are invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### d. Claim 12.

Claim 12 is identical to claim 9 of the '590 patent, except the composition can contain "anhydrous lactose" or "hydrous fast-flow lactose" and the claim does not specify the binder, lubricant or disintegrant used. These limitations only serve to broaden the limitations recited in claim 9 of the '590 patent and do not salvage the validity of the claim.

For the same reasons discussed above for claims 9 of the '590 patent and for claims 1-2 and 10-11 of the '410 patent, which are incorporated by reference herein, claim 12 is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

### e. Claim 13.

Claim 13 is identical to claims 1-2 and 10-12, except for the use of "anhydrous lactose" only.

For the same reasons discussed above for claims of the '941 and '590 patents and for claims 1-2 and 10-12 of the '410 patent, which are incorporated by reference herein, claim 13

is invalid for anticipation under 35 U.S.C. § 102(e) or, alternatively, invalid for obviousness under 35 U.S.C. § 103.

## 2.    Noninfringement of Claims 1-13.

The commercial manufacture, use, sale, importation or offer for sale of Cobalt's ANDA Product would not infringe claims 1-13 of the '410 patent, either literally or under the doctrine of equivalents.

### a.    No Literal Infringement.

All claims of the '410 patent require a pharmaceutical composition containing, among other things, "anhydrous lactose" or "hydrous fast flow lactose."

For the same reasons discussed above for claims of the '941 and '590 patents, which are incorporated by reference herein, Cobalt would not literally infringe claims 1-13 of the '410 patent because Cobalt's ANDA Product does not contain or employ anhydrous lactose or hydrous fast flow lactose.

In addition, claims 3-9 require the use of bisphosphonic acids other than alendronic acid. In particular, properly construed, claims 3-9 are limited to pharmaceutical compositions containing N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid (claim 3); 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid (claim 4); 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid (claim 5); 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid (claim 6); 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid (claim 7); 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid (claim 8); 4-(hydroxymethylene-1,1-bisphosphonic acid) piperidine (claim 9) or pharmaceutically acceptable salts thereof. These compounds are different from and do not include alendronic acid, alendronate sodium or alendronate sodium trihydrate.

Here, Cobalt's ANDA Product does not contain or employ any of the compounds recited in claims 3-9.

For these additional reasons, Cobalt's ANDA Product would not literally infringe claims 3-9.

### 3.    No Infringement Under the Doctrine of Equivalents.

The commercial manufacture, use, or sale of Cobalt's ANDA Product would not infringe claims 1-13 of the '410 patent under the doctrine of equivalents either.

The differences between Cobalt's ANDA Product and the product of the recited claims are more than insubstantial. The particular compound and excipient limitations of these claims cannot be expanded under the doctrine of equivalents to encompass products that do not contain these compounds or excipients, since such a scope of equivalents would impermissibly vitiate these limitations and also ensnare the prior art.

-76-

For at least these reasons, Cobalt's ANDA Product would not infringe any claim of the '410 patent under the doctrine of equivalents.

*    *    *

Cobalt reserves all rights to raise any additional defenses relating to invalidity, unenforceability, and noninfringement.

# EXHIBIT   B

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

JAMES W. PARRETT, JR.
302 498 6678
302 425 3083 FAX
jparrett@mnat.com

June 10, 2005

**REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

Cobalt Pharmaceuticals, Inc.
6500 Kitimat Road
Mississauga, Ontario
Canada, L5N 2B8

         Re:     *Merck & Co., Inc. v. Cobalt Pharmaceuticals, Inc.*
                 C.A. No. 05-366

To whom it may concern:

        Enclosed are copies of the Summons, Complaint for Patent Infringement Against Cobalt Pharmaceuticals, Inc., and Notice of Availability of a United States Magistrate Judge in this action, which were served on the Delaware Secretary of State on June 7, 2005, pursuant to 10 Del. C. § 3104(d). Under 10 Del. C. § 3104(d), such service is as effectual for all intents and purposes as if it had been made upon Cobalt Pharmaceuticals, Inc. within the State of Delaware.

                        Sincerely,

                        James W. Parrett, Jr.

JWP
Enclosures
cc:     Suzy S. Harbison, Esquire (by e-mail - w/o encls.)